---

(57 Misc. Rep. 66.)

### GOW v. BINGHAM et al.

(Supreme Court, Special Term, Kings County. December 10, 1907.)

**1. CONSTITUTIONAL LAW—PERSONAL RIGHTS—PERSONAL LIBERTY.**

The right to personal liberty, which exists independent of any express provision of law, includes not only absolute freedom of travel, but the preservation of the person inviolate against attack or compulsory stripping or exposure.

**2. SAME.**

Const. N. Y. art. 1, § 1, providing that no person shall be deprived of any of his rights except by the law of the land or judgment of his peers, and section 6, providing that he shall not be deprived of his liberty without due process of law, are not the sources of the right, but constitute a shield against unwarranted interference with such right by any department of the government, whether executive, legislative, or judicial.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 149.]

**3. SAME—POWERS OF GOVERNMENT.**

The act of declaring what temporary invasions of natural rights of liberty and personal immunity are necessary in the exercise of police power for the common welfare is solely a legislative prerogative, and is not within the authority of a city police force exercising a portion of the executive power of the state.

**4. SAME—MEASUREMENT OF OFFENDERS—BERTILLON SYSTEM.**

Pen. Code, § 379a, and Greater New York Charter, Laws 1901, p. 136, c. 466, § 315, make it the duty of the police to "specially preserve the public peace, prevent crime, and detect and arrest offenders." Charter, § 272, authorizes the police commissioner to make such rules, orders, and regulations as may be reasonably necessary to effect a prompt and efficient exercise of the powers conferred on him by law. Laws 1901, p. 143, c. 466, § 338, makes it the duty of every member of the police force of the city of New York, immediately on the arrest of a prisoner, to convey him before the nearest sitting magistrate, to be dealt with according to law; and Pen. Code, § 379a (Laws 1907, p. 1469, c. 626), provides that "on the determination of a criminal action in favor of accused, photographs, plates," etc., taken of him by any police officers, shall be returned on demand. Code Cr. Proc. §§ 165, 172, 303, provide that, when a prisoner is arrested for a bailable offense, he shall be taken without unnecessary delay before a magistrate, and may give bail at any hour of the day or night, and shall not be subjected to any more restraint than is necessary for his arrest and detention until produced before the court or magistrate. *Held*, that the police department of the city of New York had no authority to take a person accused of an offense into custody after he had been arraigned and admitted to bail, and take his photograph and measurements for the records of the police department under the Bertillon system.

**5. CRIMINAL LAW—PRESUMPTION OF INNOCENCE—EXTENT.**

Under Code Cr. Proc. § 389, providing that every person is presumed innocent until the contrary is proved beyond a reasonable doubt, the presumption of innocence survives all proceedings until the rendition of a verdict of guilty.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 731–737.]

**6. CONSTITUTIONAL LAW—INFRINGEMENT ON JUDICIARY—MEASUREMENT OF OFFENDERS—POLICE DEPARTMENT RULES.**

A rule of a police department to photograph and measure such persons suspected of offenses as the officials of the department determine shall be so treated is invalid, as an exercise of judicial functions by executive and administrative officers.

**7. SAME—PERSONAL SECURITY—VIOLATION—CIVIL ACTION.**

Where members of a city police department seized relator after he had been bailed for an offense and before trial, and carried him to the police station, and there compelled him to submit to be photographed, measured, etc., for the Bertillon system, such conduct constituted a gross violation of relator's right to personal security, and entitled him to sue every person concerned therein for damages.

**8. ASSAULT—ELEMENTS OF OFFENSE.**

Arrest of a person accused of an offense by police officers, after he had been admitted to bail, and the taking of his photograph and measurements by the Bertillon system, constituted an assault, for which those participating therein might be prosecuted under Pen. Code, § 219, defining such offense.

**9. LIBEL—CRIMINAL LIBEL—ELEMENTS OF OFFENSE.**

Where, after relator had been admitted to bail, he was seized by police officers and compelled to submit to have his photograph and measurements taken under the Bertillon system, such acts constituted criminal libel, as defined by Pen. Code, §§ 242, 244, 245, for which those participating therein might properly be prosecuted.

**10. MANDAMUS—RIGHT TO WRIT.**

    Where police officers illegally seized relator, after he had been admitted to bail, and subjected him to the taking of his photograph and measurements under the Bertillon system, he could not compel the destruction of such photographs, impressions, and records by mandamus, under the rule that such writ lies only to compel the discharge of a public duty, and not to undo what has been improperly done, though under color of the performance of a public duty.

Application by William Gow for a peremptory writ of mandamus against Theodore Bingham and others to compel them to destroy certain photographs, measurements, imprints, etc., taken of his person without authority. Application denied.

Martin W. Littleton, for relator.

Edward J. Lazansky, Asst. Corp. Counsel, for respondents.

BURR, J. The undisputed facts in this case are these: On the 21st of November, 1907, William Gow had been indicted by a grand jury in the County Court of Kings county, charged with the crimes of grand larceny and forgery. So far as appears, he had never before been accused, nor even suspected, of any crime. He appeared at the courthouse where the County Court was in session on the day named, and went to the office of the district attorney of the county, and there acknowledged his readiness to appear and plead to the said indictments and arrange for the giving of bail necessary to secure his release from custody pending trial. While waiting in the district attorney's office to permit arrangements between the district attorney and the County Court for his arraignment and release on bail to be perfected, one August Kuhne, a member of the police force of the city of New York, came into the office of the district attorney, and notified the said Gow that he must accompany him to police headquarters in the borough of Brooklyn, which was in a building several blocks distant from the courthouse. At that place a record is kept of photographs, measurements, and imprints taken under the Bertillon system of persons convicted of crime and also of some persons who are charged with criminal offenses, which record is familiarly known as the "Rogues' Gallery." In obedience to the command of the said Kuhne, said Gow went to police headquarters, and while there, in obedience to the command and under the authority of the police department, he submitted to having his photograph taken, and also certain measurements and imprints made under the system above referred to, which are now in the custody and control of the respondents, or some of them, as officers of the police department of the city of New York. Thereafter the said Gow was brought back by the said Kuhne to the district attorney's office, and shortly thereafter he was arraigned in the County Court, pleaded "not guilty," the amount of bail was fixed, bail given and accepted, and the prisoner discharged. This application is made for a peremptory writ of mandamus to compel the officials constituting the police department of the city of New York and those persons having the custody and control of the said photographs, records, and impressions to destroy the same as having been unlawfully taken, and as being retained without authority of law.

Two questions present themselves upon this application: First.

Was the act of the officers of the police department in compelling the petitioner to submit to having his photograph taken and these measurements and imprints made a lawful or an unlawful act? Second. If unlawful, has the petitioner redress in this form of proceeding?

There are certain rights pertaining to mankind which have their origin independent of any express provision of law, and which are termed "natural rights." One of these is the right of personal liberty. This includes not only absolute freedom to every one to go where and when he pleases, but the right to preserve his person inviolate from attack by any other person. This right to one's person may be said to be a right of complete immunity, to be let alone. Cooley on Torts (3d Ed.) 33. The inviolability of the person is as much invaded by a compulsory stripping and exposure as by a blow. Union Pacific R. R. Co. v. Botsford, 141 U. S. 250, 11 Sup. Ct. 1000, 35 L. Ed. 734; McQuigan v. D., L. & W. R. R. Co., 129 N. Y. 50, 29 N. E. 235, 14 L. R. A. 466, 26 Am. St. Rep. 507. So sacred is this right in its character that the people of the state, speaking in the most solemn form, namely, through the state Constitution, have declared that no person shall be deprived of any of his rights unless by the law of the land or the judgment of his peers. Const. N. Y. art. 1, § 1. Nor shall he be deprived of his liberty without due process of law. Id. art. 1, § 6. These constitutional provisions are not the sources of the right. They are in the nature of a shield against any unwarrantable interference with such rights by any department of the government—executive, legislative, or judicial. But, when one becomes a member of a community, this absolute right confirmed by constitutional provisions of necessity yields to another and higher right. The absolute freedom from restraint which the individual has as a natural right yields to the necessities of the public welfare, when such public welfare demands that, for its sake, this right be temporarily impaired. It is in accordance with the demand of this necessity that temporary restraint of a person accused of crime until such time as the accusation can be determined to be false or well founded finds the authority for its existence. But this right of temporary restraint is zealously guarded and restricted. While a person indicted for a felony may be arrested, the statute makes it the duty of the court issuing the warrant for his arrest to provide that, when the arrest is made, he shall be brought before the court, and not taken elsewhere, provided the court is then in session. Code Cr. Proc. § 301. If the offense is bailable, the court upon directing the warrant to issue may fix the amount of bail (Id. § 303), and the person so arrested is entitled to be taken before a magistrate without unnecessary delay, and may give bail at any hour of the day or night (Id. § 165). A person so arrested is not to be subjected to any more restraint than is necessary for his arrest and detention until produced before the court or magistrate. Id. § 172. These temporary invasions of natural right are what is known as the "exercise of the police power." The act of declaring what temporary invasions of the natural rights of liberty and personal immunity are necessary in the exercise of police power for the common welfare of the community is solely a legislative act. 1 Tiedeman's State and Federal Control of

Persons, § 2. It is necessary, therefore, for the respondents in this case to show, in the first place, legislative authority for the acts complained of. If such authority is shown, a further question will arise, whether that act was in violation of constitutional provisions, and a legitimate exercise of the police power. If no such authority is shown, the latter inquiry need not be pursued. No statute has been found which in express terms authorizes any member of the police force of this city to deprive any person of his liberty of action, or invade his right of personal immunity to the extent of requiring him to submit to having his photograph taken, and measurements and impressions of his body made, for the purpose of preserving them in the criminal records of that department simply because such person has been indicted charged with a criminal offense. The police department claim that implied authority for this startling invasion of personal liberty may be found in two provisions of the charter of the city, and in an amendment to the Penal Code, adopted at the last session of the Legislature, and which became operative on the 1st day of September last. Laws 1901, pp. 116, 136, c. 466, §§ 272, 315; Pen. Code, § 379a. By section 315 of the charter it is made the duty of the police to "especially preserve the public peace, prevent crime, and detect and arrest offenders." To subject a citizen, never before accused, to such indignities, is certainly unnecessary in order to "detect and arrest" him; for he must have been detected and arrested before he can be so dealt with. It is unnecessary to "prevent crime," for the acts for which indictment has been found, if criminal, have already been committed. The "public peace" cannot readily be disturbed by a man in the custody of the law, and his arrest will be all sufficient to accomplish that end, without imposing upon him further attack upon the inviolability of his person.

By section 272 of the charter the police commissioner is required "to make such rules, orders, and regulations" as may be reasonably necessary to effect a prompt and efficient exercise of all powers conferred upon him by law. But, if no power is conferred upon him by law in this regard, any rule which he may promulgate respecting the same is utterly void. The exercise of any such extreme police power as is here contended for is contrary to the spirit of Anglo-Saxon liberty. It is a principle of the common law which has been reinforced by statutory provisions (Code Cr. Proc. § 389), that every person is presumed to be innocent until the contrary be proved beyond a reasonable doubt. That presumption survives the finding of an indictment, arrest, arraignment, and the impaneling of a petit jury for the trial of the issue. It continues during the introduction of evidence upon the trial, the summing up of counsel, the charge of the court, and until the jury by its verdict of "guilty" has said that the presumption is overcome, or, by its verdict of "not guilty," that the presumption has become an established fact. To hold that the vague and indefinite provisions of the charter above referred to authorize the conduct of the police department which is here criticised would require us to hold that the express provisions of the Code of Criminal Procedure above referred to with regard to the arrest and detention of a prisoner (Code Cr. Proc. §§ 303, 165, 172) were repealed by implication. The

law does not favor repeal by implication of the express provisions of a statute. 1 Lewis' Sutherland Statutory Construction, 465. It is only when there is such manifest and total repugnance between the earlier and later statutes that the two enactments cannot stand together that such repeal will be inferred. Not only does such repugnance not exist in this case, but the construction contended for by the police department is in direct conflict with the provisions of the charter itself, which makes it the duty of every member of the police force under the penalty of a fine or dismissal from the force, immediately upon an arrest, to convey the offender, not to police headquarters to be photographed and measured, but "before the nearest sitting magistrate that he may be dealt with according to law." Laws 1901, p. 143, c. 466, § 338.

The remaining statute above referred to which has been cited in support of the contention of the respondents provides that:

"Upon the determination of a criminal action or proceeding against a person in favor of such person, every photograph of such person and photographic plate or proof taken or made of such person while such action or proceeding is pending, by direction or authority of any police officer, peace officer or any member of any police department, and all duplicates and copies thereof, shall be returned on demand to such person by the police officer, peace officer, or member of any police department having any such photgraph, photographic plate or duplicate in his possession or under his control." Pen. Code, § 379a; Laws 1907, p. 1469, c. 626.

The reason which induced the Legislature to pass this act may undoubtedly be found in the determination of the Court of Appeals in the Molineux Case. In the Matter of Molineux v. Collins, 177 N. Y. 395, 69 N. E. 727, 65 L. R. A. 104. In that case the relator had been convicted of the crime of murder in the first degree, and sentenced to death. Thereafter, in pursuance of an express statute, he had been photographed and measured. Subsequently it was determined that the judgment of conviction was erroneous, and it was reversed, and upon a new trial he was acquitted. In the proceeding above referred to he sought to compel the return to him or the destruction of the photographs and plates. The court held that inasmuch as at the time that the photograph was taken it was taken in pursuance of an express authority of statute relating to persons who had been convicted of crime, and inasmuch as the statute provided no relief for those whose conviction might subsequently be adjudged erroneous, the appeal for relief must be made to the Legislature, and not to the court. The act in question went further than the necessities of the case demanded. It would have been entirely sufficient to have provided that where such a photograph had been taken in pursuance of any express provision of law, and a criminal action against the subject of the picture, although he might have been at one time and before the picture was taken convicted of crime, was ultimately determined in his favor, such photograph should be destroyed. It could hardly be deemed possible that the Legislature intended to make that which was unlawful when it was done a lawful act by simply providing that the result of that unlawful act should under certain contingencies be destroyed. In the case of persons actually convicted of crime and sentenced to the state prisons or the penitentiaries of the state, or to the New York State Reformatory at Elmira, the Legislature have in express and cer-

tain language provided for the taking of such pictures and the making of such measurements. ·Laws 1889, p. 511, c. 382, § 40; Laws 1896, p. 401, c. 440.

It is not conceivable that the lawmaking power, which proceeded so carefully and by express enactments with reference to the cases of persons convicted of crime, should have intended by vague and indefinite provisions, such as the one last above referred to, to affect the sacred rights of persons presumed to be entirely innocent of any crime. No case has been cited in this state attempting to sustain the action of the police authorities in this regard. Only two have been called to my attention where the question has been considered, and I have been unable to find any others. People ex rel. Joyce v. York, 27 Misc. Rep. 658, 59 N. Y. Supp. 418; Owen v. Partridge, 40 Misc. Rep. 415, 82 N. Y. Supp. 248. In the first of these the relator had been actually convicted. In the second the court carefully refrained from passing on the question of the right of the police department in cases where conviction had not been had. It is perfectly clear, therefore, that there is no statutory authority justifying the acts of the police department which are here attacked. The real ground for their action, as it appears from the moving papers herein, is a custom of the police department which has existed for a considerable period of time of adding to the photographs and measurements of convicted criminals taken under the statutes above referred to the photographs and measurements, not of every person arrested, but only of those particular persons that in the wisdom of the police officials they deemed desirable to have in their collection, and this custom is indirectly countenanced by a rule of the department to the effect that "likenesses of persons collected for the use of the detective bureau shall be privately kept in a gallery for the official use of the police force as an aid to the prevention and detection of crime, and shall not be exhibited to any person unless such person is accompanied by an officer of the department," and that "the Bertillon system in use by the department shall be in charge of the detective bureau." Such a custom and such a rule would not of itself be sufficient to justify the conduct of the respondents here. The officers of the police department are purely executive and administrative officers. The act of determining whether the liberty of a citizen shall be infringed in the manner above referred to belongs solely to the Legislature. Inasmuch as even under the rule of the department only such suspected persons are photographed and measured as the officials of the department determine shall be so treated, the act of determining what conduct on the part of a citizen justifies such infringement upon his natural rights is an act judicial in character. To sustain a mere rule of the police department under such circumstances would be to confer upon the officials of that department not only executive, but legislative and judicial, powers. The founders of our government were exceedingly careful to distribute the sovereign power of the state between the executive, legislative, and judicial branches thereof, and to provide that neither should trespass upon the domain of the other. The time has not yet come when

the entire sovereign power of the people of the state, executive, legislative, and judicial, is united in a member of the police force. The acts of the police department here criticised were not only a gross outrage, not only perfectly lawless, but they were criminal in character. Every person concerned therein is not only liable to a civil action for damages, but to criminal prosecution for assault (Pen. Code, § 219), and also for criminal libel (Pen. Code, §§ 242, 244, 245; Roberson v. Rochester Folding Box Co., 171 N. Y. 557, 64 N. E., on page 442, 59 L. R. A. 478, 89 Am. St. Rep. 828).

Notwithstanding this, after careful examination, I am convinced that the relator has mistaken his remedy. In the absence of special statutory authority, a writ of mandamus only lies to compel one to do what ought to be done in the discharge of a public duty, and not to undo what is improperly done, even though it may have been done under the color of performance of public duty. Merrill on Mandamus, § 42; Ex parte Nash, 15 Queen's Bench, 92; In the Matter of Dental Society v. Jacobs, 103 App. Div. 86, 92 N. Y. Supp. 590; People ex rel. Joyce v. York, 27 Misc. Rep. 658, 59 N. Y. Supp. 418. In the Nash Case it appeared that the seal of a corporation had been improperly affixed to the register of shareholders, and an application was made for a writ of mandamus to compel the removal of said seal. Lord Campbell said:

"We grant it [mandamus] when that has not been done which the statute orders to be done, but not for the purpose of undoing what has been done."

It might be urged that it was the duty of the police department to keep a correct record of persons convicted of crime, and not to confuse and embarrass that record with the pictures and measurements of persons presumed to be innocent. The answer to such argument is that there is no express statutory duty imposed upon the police department in this city to keep a record even of those persons convicted of crime. But, if there had been and by inadvertence or design there had been included in that record the picture and history or the impressions of persons not properly included therein, in the absence of express statutory authority, the court could not by mandamus compel the correction of such error. A register of deeds may be compelled to record a deed which has been properly executed and acknowledged, if he refuses so to do. I apprehend, however, that if through inadvertence or design he recorded a deed improperly acknowledged, or one upon which the signature was forged, he could not be compelled by mandamus to cancel such record, although the instrument was improperly recorded.

The case of Dental Society v. Jacobs, above referred to, seems to be precisely in point. In that case it appeared that by Public Health Law, Laws 1893, pp. 1548, 1549, c. 661, §§ 161, 162, as amended by Laws 1895, pp. 419, 420, c. 626, it was the duty of every person practicing dentistry in this state to register in the office of the clerk of the county where his place of business is located. One of the conditions which would entitle him to such registration was to present to the county clerk a license issued from the regents of the University of the State of New York. Upon the presentation of such

license, and an affidavit stating his name, age, birthplace, number of license, date of issue, and other particulars in the act specified, it was the duty of the county clerk to preserve such affidavit as part of the records of his office, and to issue to such licentiate a certificate of his registration, and a transcript thereof, which transcript and license were made presumptive evidence in all courts of the facts stated therein. Subsequently to the passage of the act, and on the 19th of August, 1895, one William E. Walker presented an affidavit, in which he stated that his legal authority for practicing dentistry within this state was conferred upon him by diploma from the Wisconsin Dental College. It appeared that the Wisconsin Dental College was not a registered dental school; and it was claimed that the said college sold its diplomas, and that the said Walker had purchased the diploma from said college for the sum of $50. The State Dental Society took the matter up, and sought by mandamus to compel the county clerk to cancel, erase, and expunge from the records in his office the name of the said Walker on the book of registry of dentists, and to remove said affidavit from the files. The argument was there made that public interests demand that a true register of dentists be kept, and that in discharging this public duty the county clerk could be compelled to remove from said register the names of all persons improperly there. The court held that, notwithstanding the act of the county clerk in receiving Walker's affidavit and entering his name on the register was wholly without authority of law, yet there was no statutory duty imposed upon the county clerk or his successors, at the request of any one, to cancel and erase such registration. If there was no duty upon the clerk to make such cancellation and erasure, the court would not by mandamus compel him so to do. The failure of the county clerk to cancel and expunge the name of Walker from the register of dentists, and to remove from the files of his office the affidavit made by him, was not a failure to perform a clearly ministerial public duty, because the act of the county clerk in accepting such registration was a completed act wholly outside of public duty.

The fact that in the civil service law the Legislature have deemed it necessary to expressly provide that in the provisions relating to the rights of preference to appointment conferred upon veterans, and the provisions relating to the removal of veterans from positions in the public service, the injured party should have a remedy by mandamus for refusing to allow a preference, or to undo an unlawful act of removal (Laws 1899, pp. 808, 809, c. 370, §§ 20, 21), would seem to indicate that, but for such express statutory authority, the right to this remedy would not exist. Under the same law it was held with regard to a person claiming a privilege against removal by reason of being an exempt fireman at a time when the remedy by mandamus had not been extended to them that such relief was unavailable. People ex rel. Cochran v. Tracy, 35 App. Div. 265, 54 N. Y. Supp. 1070.

It is with great regret that I have been compelled to come to the conclusion that I cannot afford the relator relief in this form of proceeding. It seems highly probable, however, that by voluntary action

the police department will gladly undo the wrong that has been done. It is scarcely conceivable that a department of the city government whose acts are not only unlawful, but criminal in character, should hesitate to undo such acts when their attention is called to the character of them. It is made the duty of the police department under the charter to prevent crime. It remains to be seen whether under pretense of doing that they shall persistently commit crime.

The application must be denied, but without costs.