GEORGE F. ROESCH, 3RD, PLAINTIFF-RESPONDENT, v.
MARTIN J. FERBER, SHERIFF OF BERGEN COUNTY,
DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 23, 1957—Decided December 30, 1957.

232

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. Milton T. Lasher* argued the cause for appellant.

*Mr. I. William Aronsohn* argued the cause for respondent.

Mr. Grover C. Richman, Jr., Attorney-General, filed a brief amicus curiae at the request of the court (Mr. Christian Bollermann, Deputy Attorney-General, of counsel; Mr. William L. Boyan, Legal Assistant, on the brief).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Defendant appeals from a summary judgment of the Superior Court, Law Division, ordering him to return plaintiff's fingerprints and photographs for the purpose of destruction. See Roesch v. Ferber, 45 N. J. Super. 149 (Law Div. 1957).

Plaintiff, a pre-law college student resident in Middletown, New York, was arrested by a state trooper in Ramsey, Bergen County, New Jersey, for violating the speed laws. He was taken to police headquarters, where bail was fixed at $50. Not having the money he phoned his father in Middletown, who came to Ramsey and posted bail. Plaintiff had in the meantime been committed to the county jail where, over his objections, he was photographed and fingerprinted. He was released after bail had been posted and subsequently appeared in the municipal court, pleaded guilty and was fined $20 and costs.

Plaintiff then brought the present action against the Sheriff of Bergen County, on complaint and order to show cause, for the return of his photographs and fingerprints. Although he obtained a temporary restraint against the dissemination of his identification data to other law enforcement agencies, the move came too late, for they had already been sent to the New Jersey State Police and the Federal Bureau of Identification, apparently in the regular course of law enforcement administration. No answer was filed, the matter being heard and determined on plaintiff's motion for summary judgment. Holding that R. S. 53:1–14 must be read together with R. S. 53:1–13 and R. S. 53:1–15 (the text of these statutes appears below), the trial court concluded that only persons arrested for indictable offenses could be fingerprinted, photographed and measured. Although the Law Division judge acknowledged that such

methods of identification may be used and the data retained in the case of an indictable offense—and this whether or not an indictment was actually returned or a conviction obtained —he said, "there is nothing that would permit a person charged with violation of a traffic offense to be fingerprinted and photographed." In his opinion, there was "considerable embarrassment" involved in being fingerprinted and photographed and having this information disseminated, and he concluded that "It certainly was never intended that this should be the lot of a person arrested for a traffic offense."

On appeal the defendant contends that sheriffs and other law enforcement officials charged with the custody of prisoners not only have the right but the duty to fingerprint and photograph all persons committed to their custody, regardless of the seriousness of the charge—and this not only by virtue of the statute, *R. S.* 53:1–14, but also under the common law. Whether such identification should be returned or retained rests solely, it is said, in the discretion of the police authorities. If there has been any invasion of plaintiff's claimed right of privacy, that is an inconvenience to which he must necessarily submit. It is part of the price every one pays for being a member of society.

We consider defendant's position sound and well supported by authority, so as to require reversal of the judgment under review.

## THE STATUTORY LAW

The statutes considered by the trial judge and discussed in the briefs are:

*R. S.* 53:1–13.

"The supervisor of the state bureau of identification shall procure and file for record, fingerprints, plates, photographs, pictures, descriptions, measurements and such other information as may be pertinent, of all persons who have been or may hereafter be convicted of an indictable offense within the state, and also of all well known and habitual criminals wheresoever the same may be procured.

The person in charge of any state institution shall furnish any such information to the supervisor of the state bureau of identification upon request of the superintendent of state police."

## R. S. 53:1–14.

"The supervisor of the state bureau of identification may procure and file for record, fingerprints, photographs and other identification data of all persons confined in any workhouse, jail, reformatory, penitentiary or other penal institution and shall file for record such other information as he may receive from the law enforcement officers of the state and its subdivisions.

The wardens, jailers or keepers of workhouses, jails, reformatories, penitentiaries or other penal institutions shall furnish the state bureau of identification with fingerprints and photographs of all prisoners who are or may be confined in the respective institutions, and shall also furnish such other information respecting such prisoners as may be requested."

## R. S. 53:1–15.

"The sheriffs, chiefs of police, members of the State Police and any other law enforcement agencies and officers, shall immediately upon the arrest of any person for an indictable offense, or of any person believed to be wanted for an indictable offense, or believed to be an habitual criminal, and immediately after the conviction of any person of violations of the provisions of section 2A:170–8 of the New Jersey Statutes, take the fingerprints of such person according to the fingerprint system of identification established by the Superintendent of State Police and on the forms prescribed, and forward without delay two copies or more of the same, together with photographs and such other descriptions as may be required and with a history of the offense committed, to the State Bureau of Identification.

Such sheriffs, chiefs of police, members of the State Police and any other law enforcement agencies and officers shall also take the fingerprints, descriptions and such other information as may be required, of unknown dead persons and forward same to the State Bureau of Identification."

These sections stem from *L. 1930, c. 65, §§ 2 and 3.* We are particularly concerned with the provisions of *R. S. 53:1–14*, for we deal here with a person who was not merely charged with violating the Motor Vehicle and Traffic Act but one who was actually committed to the county jail in default of bail, subsequently pleaded guilty, and was fined.

■ *L.* 1930, *c.* 65, now *R. S.* 53 :1–12 *et seq.,* created a State Bureau of Identification within the Department of State Police and under the supervision and control of the Superintendent of State Police. The stated purpose of the act was "to provide a central identification bureau for the State of New Jersey, thereby coordinating all identification work throughout the State and complying directly with the national program of criminal identification throughout the country." *Statement, Senate Bill No.* 193 (1930). The obvious aim of this legislation was to insure as comprehensive and effective a system of collecting and coordinating fingerprint and other identification data as possible. The act was not meant to inhibit the discretionary authority of law enforcement officials, resting in common law (discussed below), to obtain such information in the same manner as theretofore. It supplemented rather than supplanted that authority. There is not a single word in the 1930 law to indicate any legislative intention to limit or abolish existing powers or procedures.

A comparison of *L.* 1930, *c.* 65 with *R. S.* 53 :1–12 *et seq.* demonstrates that the *Revision of* 1937 involved no substantive changes but only a rearrangement of the several sections of the act. The two paragraphs making up *R. S.* 53 :1–14 are respectively taken from the last sentence of section 2 and the third sentence of section 3 of *L.* 1930, *c.* 65. Considered in their original setting, it is clear that these sentences were intended to enlarge the means of obtaining identification data. No other provision exists for collecting such data covering "all prisoners who are or may be confined in the respective [penal] institutions" throughout the State. The language of *R. S.* 53 :1–14 is not qualified by any requirement that such persons should have been confined because of an indictable offense.

*R. S.* 53 :1–13 concerns itself with the mandatory collection by the Supervisor of the State Bureau of Identification of the fingerprints, photographs, descriptions and measurements of all persons convicted of an indictable offense within the State, and also of habitual criminals. *R. S.* 53 :1–15 is

addressed to sheriffs, police chiefs and other law enforcement officers and agencies, and requires that they supply such identification data in the case of all persons arrested for an indictable offense, or believed to be wanted for an indictable offense or to be an habitual criminal. By contrast with these two sections, *R. S.* 53:1–14 deals with an entirely different category, namely, all persons confined in any workhouse, jail, reformatory, penitentiary or other penal institution. It provides not only that the Supervisor of the State Bureau of Identification may call for the identification data, but also that the keepers of such institutions must furnish them in any case. This section provides an additional source for obtaining fingerprints and photographs, thus insuring as complete an identification system as possible within the State for law enforcement purposes.

The omission from *R. S.* 53:1–14 of the phrase "indictable offense" appearing in other provisions of the act must be construed as having been deliberate, and full effect must be given to that omission. *State v. Gray,* 37 *N. J. L.* 368 (*Sup. Ct.* 1875). We are not at liberty to supply language which the Legislature did not use, particularly when we recall the stated purpose and setting of the original 1930 act, which was to establish a comprehensive identification system for New Jersey.

In *McGovern v. Van Riper,* 137 *N. J. Eq.* 24, 31–32 (*Ch.* 1945), affirmed 137 *N. J. Eq.* 548 (*E. & A.* 1946), the trial court listed seven distinct classes of persons covered by the act. Included in the group, in addition to persons wanted, arrested or convicted for an indictable offense, are persons confined in workhouses, jails, reformatories, penitentiaries and other penal institutions. The broad scope of the statute is illustrated by the court's comment that one confined in jail on a charge of disorderly conduct would have his fingerprints and photograph taken and "distributed to the four corners of the globe." (As in the case of motor vehicle and traffic violations, the Disorderly Persons Act does not require an indictment for prosecution. *N. J. S.* 2A:169–1 *et seq.*) Although this application of the act

was not, perhaps, stated with approval by the court, it is in harmony with the clear language of the statute.

The Law Division judge relied in part on *Oberg v. Department of Law and Public Safety*, 41 *N. J. Super.* 256 (*Juv. & Dom. Rel. Ct.* 1956). In that case plaintiff, 14 years old, was arrested for murder and his fingerprints taken. He was indicted, but the indictment was later dismissed and the matter referred to the Juvenile and Domestic Relations Court. Plaintiff was successful in obtaining the return of his prints. The court there said that *R. S.* 53:1–15 authorized fingerprinting of only persons charged with an indictable offense, and plaintiff, because of his age, could not be so charged. See *N. J. S.* 2A:85–4. In addition to the fact that the court in *Oberg* was dealing with *R. S.* 53:1–15 and not *R. S.* 53:1–14, there is the further consideration that children under 18 are considered in a special class as wards of the State and entitled to all of the protection that can possibly be afforded them. See the Juvenile & Domestic Relations Court Act, *N. J. S.* 2A:4–1 *et seq.*, particularly *N. J. S.* 2A:4–2 and 2A:4–14; but see *N. J. S.* 2A:4–15. New Jersey considers it detrimental to a child to have his fingerprints taken and retained where he is found not guilty or the charge dismissed; in such case the State Bureau of Identification or any police department must, upon demand, surrender the prints for destruction. *N. J. S.* 2A:4–21. We note, however, that *N. J. S.* 2A:4–14 excludes motor vehicle and traffic violations from the definition of juvenile delinquency and so from the protection usually afforded infants, thus removing the present case from the reach of the *Oberg* decision.

▮ That *R. S.* 53:1–14 does not prohibit but indeed requires the fingerprinting, photographing and taking of other identification data of all persons confined, even those committed for a violation of the motor vehicle and traffic laws, is indicated by *N. J. S.* 2A:8–17 (*L.* 1886, *c.* 140, § 20) which provides that

"It shall be the duty of the sheriff, warden and jailer of the county to receive all persons who shall be apprehended or committed to jail, and to keep the same as prisoners, in the same way and under the same regulations and penalties as other prisoners are by law required to be kept."

That law is addressed to the treatment of persons committed to jail by authority of the laws governing the municipal courts. This would include persons committed for violations of the motor vehicle and traffic laws, for such jurisdiction is specifically conferred upon the municipal courts. *N. J. S.* 2*A*:8–21(*a*). Under *N. J. S.* 2*A*:8–17 all persons confined are to be treated as "prisoners." No distinction is made as to the quality of the offense committed—whether high misdemeanor, misdemeanor or a simple offense. Uniformity of treatment and equal application of regulations is mandatory. It follows that all persons confined must be identified in the same way. Subjection to fingerprinting and photographing cannot be considered as an additional penalty, for otherwise no such records could ever be made. They are purely incidental to proper law enforcement. *Bartletta v. McFeeley,* 107 *N. J. Eq.* 141, 143, 145 (*Ch.* 1930), affirmed 109 *N. J. Eq.* 241 (*E. & A.* 1931).

Though an obvious purpose of the State Bureau of Identification Act, *R. S.* 53:1–12 *et seq.,* is to obtain identification data of those involved or suspected of being involved in indictable offenses, another important purpose is to permit positive identification of individuals committed to a jail. It can judicially be noticed that there is, as yet, no other means of identification which affords the same assurance of correctness that fingerprinting does. See *United States v. Kelly,* 55 *F. 2d* 67, 69, 83 *A. L. R.* 122 (2 *Cir.* 1932). The keeper of a workhouse or county jail receives a great variety of persons into his custody, some of them minor offenders and others involved in serious infractions of the law. Once the latter are commingled with other prisoners it becomes possible for them to masquerade as one of the minor offenders unless all prisoners are fingerprinted. As the Attorney-General points out in his brief filed *amicus*

*curiae* at the request of this court, the device of a deliberate exchange of identification among prisoners is well known to the police. This consists of an agreement between two persons committed to jail at about the same time, to answer to each other's name, to sign each other's name and to carry each other's identification card. The fingerprinting and photographing of all prisoners received by the sheriff, including those received from municipal courts, is the only certain method of preventing this situation.

The necessity of promptly taking the identification data of those committed to a jail is made manifest when one considers the likelihood of escape attempts. Without such identification the probability of tracing down a prisoner and taking him back into custody is substantially diminished or completely destroyed. The importance of identification as a means of determining whether the person held for a minor offense may not be wanted in some other place for a quite serious offense, is likewise manifest. Time and again there have been instances of a person stopped on the road for a motor vehicle or traffic violation who, after fingerprinting and photographing, is found to be wanted by law enforcement authorities elsewhere for a major crime.

To read *R. S.* 53:1–14 in the manner the trial court did, thereby in effect inserting the requirement that the person confined in the workhouse, jail or other penal institution be so held for an indictable offense, may have the ultimate effect of prohibiting the retention of records of those convicted of disorderly person offenses. (*N. J. S.* 2A:170–1 *et seq.,* enumerates well over 100 such offenses), a broad category often so closely bound up with criminal behavior that it is of extreme importance to crime detection for the State Bureau of Identification and police departments to retain such records.

We may incidentally note that it has specifically been held that the act in question does not deal with the retention of identification records after acquittal or the running of the statute of limitations. *Fernicola v. Keenan,* 136 *N. J. Eq.* 9 (*Ch.* 1944).

■ We conclude, therefore, that the purpose of the 1930 act, *R. S.* 53 :1–12 *et seq.*, was not to delimit the discretionary authority of law enforcement officials to take and retain fingerprint and photographic records in the case of non-indictable offenses, but rather to increase such authority, where necessary, in order to bring about an efficient and comprehensive method of collecting such data.

## The Common Law

It has long been recognized that the individual, as a member of the community, must give up certain of his rights to the control of the general public, *i. e.*, society. Hobbes, in writing of the liberty of subjects, said:

"But as men, for the attaining of peace and conservation of themselves thereby, have made an artificial man, which we call a *Commonwealth;* so also have they made artificial chains, called *civil laws*, which they themselves, by mutual covenants, have fastened at one end to the lips of that man, or assembly, to whom they have given the sovereign power, and at the other end to their own ears. These bonds, in their own nature but weak, may nevertheless be made to hold, by the danger, though not by the difficulty of breaking them." *Leviathan, c.* XXI (1651) (23 *Great Books of the Western World*, 49, 113 (1952) ).

See also 4 *Works of John Locke* (12th *ed.* 1824), *Book* II, *c.* VIII, *"Of the beginning of political societies,"* p. 394. Blackstone embraced this basic concept in his *Commentaries:*

"\* \* \* But every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish."

*Bl. Comm.*, 125 (1 *Jones ed.* 211, 1915).

It cannot now be denied that in certain areas within the legitimate control of society as an entity the individual must submit to what otherwise might be considered an invasion of his personal rights or his privacy. Thus, when the common law right of police authorities in New Jersey to

fingerprint and photograph a prisoner whenever in their discretion they deemed it necessary, was established in *Bartletta v. McFeeley,* 107 *N. J. Eq.* 141 (*Ch.* 1930), affirmed 109 *N. J. Eq.* 241 (*E. & A.* 1931), the court was merely applying this basic principle of social compact to what it considered a proper field of community control. Whether or not a prisoner is to be fingerprinted prior to conviction was held to be an administrative question to be decided by the police head or by those subordinates to whom he may have delegated the decision. Vice-Chancellor Bigelow there said:

"\* \* \* The police department have the responsibility of the safety of the people and they must be given the necessary discretion to enable them successfully to assume this responsibility. When an arrest is made, the police frequently are unfamiliar with the record of their prisoner and one of the purposes of circulating his description among other police departments is to learn whether or not he is a first offender. No rule can be laid down to guide the police so that they may know whether or not the prisoner in their hands is one whom they had best watch carefully in the future or is one who is liable to escape before trial. No distinction can be made by the court between prisoners charged with high misdemeanors and those charged with misdemeanors. The fingerprinting of the latter is frequently as important as the fingerprinting of the former. Of course, in these as in other matters, the police must not be actuated by malice." (107 *N. J. Eq.* at *pages* 145–146).

Bartletta had been charged with a high misdemeanor. Seeking the return of his prints and photographs, which had been taken over his objections, he contended that this police action before trial and conviction was illegal. In holding against him the court stated that

"The right of the police to fingerprint and photograph is powerfully supported by the argument from convenience and from the public interest in permitting the courts to learn the truth of the questions at issue. This right is also upheld by custom. The police in the large cities of this state and throughout the country for half a century have measured, photographed or fingerprinted prisoners before trial; and their authority to do so has been seldom questioned and, so far as I can learn, only once denied by the judgment of a court." (107 *N. J. Eq.* at *page* 143).

*Cf.* Justice Parker's concurring opinion on affirmance, 109 *N. J. Eq.* 241.

Similar holdings had been made prior to *Bartletta* in other jurisdictions, approving the legality, in the absence of statute, of the taking of photographs and Bertillon measurements prior to conviction. *Mabry v. Kettering*, 89 *Ark.* 551, 117 *S. W.* 746 (*Sup. Ct.* 1909); *State ex rel. Bruns v. Clausmeier*, 154 *Ind.* 599, 57 *N. E.* 541, 50 *L. R. A.* 73 (*Sup. Ct.* 1900); *Downs v. Swann*, 111 *Md.* 53, 73 *A.* 653, 23 *L. R. A., N. S.*, 739 (*Ct. App.* 1909); see, generally, *Annotation*, 83 *A. L. R.* 127 (1933); 14 *Am. Jur., Criminal Law*, § 133, *p.* 856 (1938). *Contra, Hawkins v. Kuhne*, 153 *App. Div.* 216, 137 *N. Y. S.* 1090 (*App. Div.* 1912), affirmed 208 *N. Y.* 555, 101 *N. E.* 1104 (*Ct. App.* 1913); *Gow v. Bingham*, 57 *Misc.* 66, 107 *N. Y. S.* 1011 (*Sup. Ct.* 1907). In *Clausmeier*, an unsuccessful action against the sheriff for damages, the court said that the sheriff has the right to take such steps and adopt such measures as, in his discretion, may appear to be necessary to the identification and recapture of persons in his custody if they escape. The *Downs* case upheld the right to take photographs and Bertillon measurements, providing, however, that the photographs were not displayed in the rogues' gallery prior to conviction. The court stated that most if not all of the jurisdictions treating the subject had approved the taking of such measurements, although some (citing, *inter alia*, the New York cases above) had denied the right prior to conviction; and further held there had been no violation of constitutional rights, citing with approval *Shaffer v. United States*, 24 *App. D. C.* 417 (1904), *certiorari* denied 196 *U. S.* 639, 25 *S. Ct.* 795, 49 *L. Ed.* 631 (1905).

The sequel to the *Bartletta* case appears in *Bartletta v. McFeeley*, 113 *N. J. Eq.* 67 (*E. & A.* 1933) (adopting Vice-Chancellor Bigelow's second Chancery opinion *in toto*). In his new bill of complaint Bartletta alleged that he had not been indicted and was protected from prosecution by the running of the statute of limitations. He sought the removal from the rogues' gallery, not only in Hoboken where

he was arrested but elsewhere, and the surrender to him of his fingerprints, photographs and measurements, and also the expunging of the words "alias Luke Adams" after his name in the Hoboken police records. The local police having voluntarily surrendered the requested items, the court considered the first question moot, noting that it had no jurisdiction over out-of-state agencies. It refused plaintiff's second request, although it was alleged and proved that he had never assumed or been known by the indicated alias. Stating it was unable to see how plaintiff could be injured by refusal of relief, the court doubted its authority in such a case to exercise "the delicate power of ordering the record changed."

*Fernicola v. Keenan,* 136 *N. J. Eq.* 9 (*Ch.* 1944), came after the second *Bartletta* case. There plaintiff was arrested on a charge of assault and battery, and fingerprinted, measured and photographed. No indictment was returned. The court denied him the return of his identification data, stating that the taking of the fingerprints in the first place and the whole process of arrest of a possibly innocent person are "a humiliation to which he must submit for the benefit of society." It recognized that there may be circumstances justifying the return of such records or their removal from the rogues' gallery. But the court held (136 *N. J. Eq.* at *pages* 10–11) that the 1930 statute did not deal with the retention of these records and, "in the absence of statute, discretion in the matter belongs to the police. Since they are responsible for our safety, it is for them to decide whose identification papers will be apt to assist them in the performance of their duty. It is not for the court to make the decision. For these reasons, the bill will be dismissed."

The two leading cases in other jurisdictions are *United States v. Kelly,* 55 *F. 2d* 67 (2 *Cir.* 1932), and *State ex rel. Mavity v. Tyndall,* 224 *Ind.* 364, 66 *N. E. 2d* 755 (*Sup. Ct.* 1946), reaffirmed in 225 *Ind.* 360, 74 *N. E. 2d* 914 (*Sup. Ct.* 1947), appeal dismissed 333 *U. S.* 834, 68 *S. Ct.* 609, 92 *L. Ed.* 1118 (1948), rehearing denied 333 *U. S.* 858,

68 *S. Ct.* 732, 92 *L. Ed.* 1138 (1948). In *Kelly* the plaintiff had been charged with a misdemeanor and fingerprinted over his protests. Upon his application for the return of his prints the lower court held that in the absence of a state or federal statute providing for the taking of fingerprints, and because of the "unnecessary indignity" imposed upon a misdemeanant, the right to take the prints did not exist. In reversing, the Court of Appeals rested its decision upon the general right of law enforcement authorities to use fingerprinting as a proper means of criminal identification and detection of crime, citing with approval the Chancery opinion in *Bartletta v. McFeeley,* above. Judge Augustus Hand stated that although any restraint of the person may be burdensome, some restraints must be borne in the common interest and for the good of the community. Distinguishing the New York cases of *Hawkins v. Kuhne* and *Gow v. Bingham,* above, he said:

"We find no ground in reason or authority for interfering with a method of identifying persons charged with crime which has now become widely known and frequently practiced both in jurisdictions where there are statutory provisions regulating it and where it has no sanction other than the common law.

*  *  * [Fingerprinting] is no more humiliating than other means of identification that have been universally held to infringe neither constitutional nor common-law rights. Fingerprinting is used in numerous branches of business and of civil service, and is not in itself a badge of crime. As a physical invasion it amounts to almost nothing, and as a humiliation it can never amount to as much as that caused by the publicity attending a sensational indictment to which innocent men may have to submit." (55 *F.* 2*d* at *page* 70).

*State ex rel. Mavity v. Tyndall,* above, involved a plaintiff who had been charged but subsequently acquitted of a misdemeanor, and who sought the return of his fingerprints, photographs and other identification data and the prohibition of the exhibition of his photographs in the rogues' gallery. Relief was denied insofar as the return of the records was concerned. The plaintiff had conceded that the arresting officers were within their rights in taking his fingerprints

and photographs, but contended that after his acquittal the records were no longer needed and should either be destroyed or surrendered. He based his claim upon his right of privacy.

In its first opinion the Indiana court entered into an extensive discussion of the right of privacy, particularly in relation to police identification practices. Recognizing that the right of privacy exists (citing Warren and Brandeis, "The Right to Privacy," 4 *Harv. L. Rev.* 193 (1890)), and that it may properly be enforced in equity, the court nevertheless held that the taking of fingerprints under ordinary circumstances, and the retention of them by the police, is not an indignity and could not harm the plaintiff. Referring to the practice of fingerprinting newly born babies and their mothers, all military service personnel, and applicants for passports and various licenses, the court found no harm in the presence of these records in the public files. Accordingly, it held there was no valid reason for their surrender or destruction by the police. Quoting *Fernicola v. Keenan,* above, 136 *N. J. Eq.* 9 (*Ch.* 1944) in full, the court refused to substitute a judicial discretion for the executive discretion permitted by the absence of restrictive legislation—although it recognized that exceptional cases might arise justifying the return of such records. The court did, however, grant plaintiff an injunction against the exhibition of his photograph in the rogues' gallery.

In its second opinion the Indiana Supreme Court reaffirmed its holding in the first case and further held that there was no violation or abridgement of constitutional rights by the statutes providing for the fingerprinting of prisoners, under the authority of which it was alleged that the prints were retained. See also *Voelker v. Tyndall,* 226 *Ind.* 43, 75 *N. E.* 2d 548 (1947), which again upheld the right of law enforcement authorities to retain identification records even after acquittal, in accordance with the statutory command to file such material.

*Bridges v. State,* 247 *Wis.* 350, 19 *N. W.* 2d 529, 862 (*Sup. Ct.* 1945), concerned the admissibility of police testi-

mony that the defendant's fingerprints and photographs were taken. Disposing of his claim of prejudice, the court said:

"\* \* \* It is commonly known that such photographing and fingerprinting is a matter of daily practice and the usual method of identification used in the police service in populous communities of persons arrested,—but not yet convicted,—for violations. The use of that practice and method is considered to be for the common good and the rights of police authorities to resort thereto has been recognized in most jurisdictions, and such use thereof is, in itself, not considered a badge of crime." (247 *Wis.* at *page* 373, 19 *N. W. 2d* at *page* 539)

New Jersey law was further developed by the *McGovern* cases; *McGovern v. Van Riper*, 137 *N. J. Eq.* 24 (*Ch.* 1945), affirmed 137 *N. J. Eq.* 548 (*E. & A.* 1946); *McGovern v. Van Riper*, 140 *N. J. Eq.* 341 (*Ch.* 1947). McGovern was the sheriff of Hudson County, and was indicted for failure to comply with *L.* 1930, *c.* 65, the same statute under consideration in the present case, in that he did not fingerprint and photograph all those covered by the law. In the first Chancery case McGovern sought the continuance of a preliminary injunction against the taking of his fingerprints and photographs and their dissemination to other law enforcement agencies. Specifically recognizing the existence of the right of privacy and the right to its enforcement in equity, the court permitted the taking of the data in the first instance but enjoined the dissemination of the records in advance of conviction unless the plaintiff became a fugitive from justice. (The court's view that the right of privacy is "immutable and absolute, and transcends the power of any authority to change or abolish it" (137 *N. J. Eq.* at *page* 33), was held unsound in *State ex rel. Mavity v. Tyndall,* above, 224 *Ind.* 364, 66 *N. E. 2d* 755 (*Sup. Ct.* 1946). And in *McGovern v. Van Riper,* 140 *N. J. Eq.* 341, 345–346 (*Ch.* 1947), it was held that "the right of privacy has its limitations and such right is not always superior to the rights of the public but must be construed in the light of the individual's

relation to the community or society of which he is a member.")

On appeal the Court of Errors and Appeals, concerned only with the lifting of the restraint against taking McGovern's fingerprints and photographs (the State not having appealed the injunction against dissemination) unanimously approved the result below. The taking of identification data before trial and conviction was considered lawful; "Fingerprints and photographs are useful means for the recapture of escaped prisoners and detection of second offenders and the slight interference with the person entailed thereby is well warranted in the common interest." (137 *N. J. Eq.* at *pages* 549–550) The court expressly did not comment on dissemination of such material before conviction.

The final determination of this litigation came in the second Chancery opinion, 140 *N. J. Eq.* 341 (1947), where several persons who had been indicted for misdemeanors sought to restrain McGovern from taking and disseminating their fingerprints and photographs in advance of conviction. The question presented was whether the dissemination (as required by statute) of fingerprints and photographs lawfully taken is an unwarranted invasion of the right of an individual to be free from intrusion into his private life. Comparing the necessity of an individual accepting restrictions upon his "so-called natural rights" in order to protect those that he does retain, with the right of privacy recognized in *McGovern v. Van Riper,* 137 *N. J. Eq.* 24 (*Ch.* 1945)—a right which is not absolute but relative—Vice-Chancellor Fielder held that the steps provided by the Legislature for the due administration of the criminal laws of the State could not be branded an unwarranted infringement of McGovern's right of privacy. He said:

"I think the two *Bartletta cases* and the *Fernicola case,* when read in connection with *McGovern v. Van Riper,* 137 *N. J. Eq.* 548, lead to the conclusion that the statute in question is within the proper exercise of the police powers of the state for the purpose of facilitating crime detection and punishment in the interest of

society generally and that one who has been indicted must submit to such slight invasion of his claimed right of privacy as may accompany the performance of the police duty required by the statute." (140 *N. J. Eq.* at *page* 347)

The bills of complaint were dismissed. And see *Hansson v. Harris,* 252 *S. W.* 2d 600 (*Tex. Civ. App.* 1952), where a violation of a municipal ordinance and prosecution was barred by statute of limitations. Recovery of prints and photographs was denied, the right of privacy not being recognized for this purpose; and *Kolb v. O'Connor,* 14 *Ill. App.* 2d 81, 142 *N. E.* 2d 818 (*App. Ct.* 1957), denying the return of identification data after acquittal, and holding that a statute calling for such return must be limited to the law enforcement agency therein named.

For discussions of the cases involving the taking and retention of criminal identification records in the varying context of personal rights, see generally Annotation, "Right of Privacy," 14 *A. L. R.* 2d 750, 761, 770 (1950), supplementing the annotations in 168 *A. L. R.* 446, 461 (1947) and 138 *A. L. R.* 22, 89 (1942); Annotation, "Jurisdiction of equity to protect personal rights; modern view," 175 *A. L. R.* 438, 493 (1948); Annotation, "Right to take finger prints and photographs of accused before trial, or to retain same in police record after acquittal or discharge of accused," 83 *A. L. R.* 127 (1933). The weight of authority supports the resting of discretion in the police authorities as to whether identification records should be returned or not.

The law reviews, in balancing the interest of the public against the rights of the individual, also support the weighting of the scales in favor of the public insofar as the retention of fingerprint and photograph records are concerned. This is qualified by the general view that each case should be decided on its own facts, for it is conceivable that a case justifying relief might arise. See the excellent analysis in Note, "The Right of Persons Who Have Been Discharged or Acquitted of Criminal Charges to Compel the Return of Fingerprints, Photographs, and Other Police Records," 27

*Temple L. Q.* 441 (1954); also Notes, 26 *Boston U. L. Rev.* 526 (1946); 23 *Notre Dame L. Rev.* 380 (1948); 21 *Tulane L. Rev.* 289 (1946). See Note, 106 *U. of Pa. L. Rev.* 303 (1957) criticizing the decision of the trial court appearing in 45 *N. J. Super.* 149 (*Law Div.* 1957).

To apply the holding of *Bartletta v. McFeeley* and *Fernicola v. Keenan,* above, to instances where the fingerprints and photographs of a person charged with violating a motor vehicle or traffic law and committed to the county jail have been obtained, does not involve too great an extension of the rule. It still remains within the discretion of the police to retain or return the records. The reasoning of the cases we have cited applies equally as well to minor as well as major offenses. We have seen that courts recognize that situations may possibly arise where equitable relief such as that sought here may be warranted. However, the equities must be strongly in favor of the complainant for this court to interfere with the valid administrative procedures of our law enforcement agencies. We now reaffirm that where no statute prohibits the taking or governs the return of identification records, the retention or return of such records lies solely within the sound discretion of the police authorities.

## CONCLUSION

The relief sought by plaintiff must be denied, and the judgment below reversed. It should be remembered that plaintiff was incarcerated in the county jail by reason of his own violation of the law, and he was convicted, upon a plea of guilty, of the charge against him. No case, either in New Jersey or elsewhere, has even considered the return of fingerprints and photographs where the person involved was convicted of the charge.

It would be illogical to say that one convicted of a motor vehicle or traffic violation is entitled to the return of fingerprints and photographs which were lawfully taken, whereas an innocent person, accused but acquitted of a greater offense,

is not. See *General Opinions of the Attorney-General of New Jersey, No. 79, page 266* (November 17, 1950).

Plaintiff presents no equities for his case. Aside from the mere assertion of humiliation and embarrassment resulting from being fingerprinted and photographed, he does not demonstrate how he will be injured in the future by the police retention of such records. He makes the claim that the identification records in question may possibly present practical difficulties when he seeks admission to the New York bar. That assertion is indeed tenuous. The mere presence of the prints in New Jersey police files does not make the violation any worse, and assuredly plaintiff will not be considered as suggesting that he would otherwise conceal the traffic violation from the New York character committee.

The continually expanding use of fingerprints has dispelled the alleged stigma formerly associated with police identification measures. A most revealing use in New Jersey, illustrative of the innocuous effect of such a practice, is the fingerprinting of all candidates for admission as attorneys to the New Jersey bar. *R. R.* 1:19–4. Further reference can be made to the mandatory fingerprinting, *inter alia,* of employees of licensed private detectives, *N. J. S. A.* 45:19–16; school bus drivers, *N. J. S. A.* 18:14–12.12, and check-cashing licensees, *N. J. S. A.* 17:15A–3.

The judgment will be reversed.

#### Addendum

The Attorney-General in his brief informs us that if the present system is continued plaintiff's photographs and fingerprints will remain in the criminal files, the former appearing in a special classification devoted to motor vehicle violations. Thus, the photographs will not be exhibited to witnesses or other persons except where a motor vehicle offense is involved. The fact of plaintiff's violation will, of course, be available to law enforcement officials through the Division of Motor Vehicles. See *N. J. S. A.* 39:5–42.

The State Bureau of Identification has indicated its willingness, if the court so recommends, to separate both the photographs and fingerprints of motor vehicle violators from its criminal files. We will not impose a judicial suggestion upon the purely executive discretion involved in adopting such procedures. If the Bureau, in the interests of fairness and enlightened criminal administration, wishes to take such a step, it is free to do so.