**FOREMOST LIFE INSURANCE COMPANY, Petitioner Creditor-Appellant,**

v.

**DEPARTMENT OF INSURANCE, State of Indiana, Liquidator of Keystone Life Insurance Company, Respondent Liquidator-Appellee.**

No. 1–179A12.

Court of Appeals of Indiana, First District.

Sept. 27, 1979.

Rehearing Denied Nov. 7, 1979.

C. Wendell Martin, Bredell, Martin, McTurnan & Meyer, Indianapolis, for petitioner creditor-appellant.

Karl J. Stipher and Charles T. Richardson, Baker & Daniels, Indianapolis, for respondent liquidator-appellee.

ROBERTSON, Judge.

Foremost Life Insurance Company (Foremost) brings this interlocutory appeal from an adverse order denying it the status of a class three creditor under *Ind. Code* 27–1–4–15 in the statutory liquidation of Keystone Life Insurance Company (Keystone). See IC 27–1–4–1 *et seq.*[1] Foremost contends that by virtue of a certain "Life and Disability Reinsurance Treaty" (Treaty) entered into with Keystone, Foremost acquired an insurance interest that the legislature intended to be preferred over general creditors. The priority statute in issue provides:

Claims against a company declared to be insolvent under the provisions of this chapter shall be satisfied in the following order of priority:

(1) Expenses of administration.

(2) All wages actually owing to its employees for services rendered with three (3) months prior to the commencement of such proceeding, not exceeding three hundred dollars ($300) to each employee, which shall be paid prior to the payment of any other debt or claim, and subject to the direction of the court, shall be paid as soon as possible after liquidation has been commenced.

(3) Claims by policyholders, beneficiaries, and insureds arising from and within the coverage of and not in excess of the applicable limits of insurance policies and contracts issued by the company, and liability claims against insureds which claims are within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company and claims of the Indiana Insurance Guaranty Association established under IC 27–6–8 and any similar organization in another state.

(4) All other claims.

At the outset, we do not hesitate in the conclusion that the legislature intended to protect the typical insurance consumer by using the terms "policyholders, beneficiaries, and insureds." Prior to the enactment of the statute in issue, the ordinary consumer was not given a preference upon the insolvency of a carrier, and it was generally recognized that a preference could only be created by express legislative action. *See Cummings Wholesale Electric Company, Inc. v. Home Owners Insurance Company,* 492 F.2d 268 (7th Cir. 1974) *cert. denied, Delphi Community School Building Corp. v. Northeastern Insurance Company of Hartford,* 419 U.S. 883, 95 S.Ct. 149, 42 L.Ed.2d 123.

In Indiana, a carrier's insolvency constitutes a material breach of outstanding policies and contracts of insurance thereby entitling the ordinary consumer to a return of unearned premiums. *Bushnell, Receiver etc. v. Krafft et al.,* (1962) 133 Ind.App. 474, 183 N.E.2d 340.[2] Such claimants could be either an "insured" or a "policyholder" within the meaning of the priority statute. For example, if an individual carried his own life insurance, upon insolvency of the insurer, he would be entitled as an "insured" or a "policyholder" to a return of unearned premiums. If the policy was funded by an employer, the employee would be insured but the employer would be the policyholder entitled to a return of

---

1. For present law, *see* IC 27–9–1–1 *et seq.*

2. *Compare* IC 27–9–3–8.

unearned premiums. Of course if the insured died prior to insolvency, the beneficiary would have a preferred status in recovering the proceeds due under the original policy or contract of insurance.

Similarly, we are impressed by the protection accorded third parties who, like named beneficiaries, would be entitled to proceeds under original policies or contracts of liability insurance. Again, this protection buttresses the proposition that the ordinary consumer, whether entitled to proceeds or unearned premiums, was clearly within the legislature's intent.

With the foregoing in mind, we are faced, superficially, with the issue of whether Foremost was intended to be included in the class of ordinary consumers. The more fundamental issue, to which we now turn, is the nature of the Treaty between Foremost and Keystone.

■■■ In the court below, the parties stipulated [3] to the following relevant facts. Foremost is a Michigan stock insurance company that holds certificates of authority to write insurance in every state with the exception of New York and Hawaii. As part of its business, Foremost sells credit life and disability insurance. Keystone is a domestic stock insurance company that has no authority to conduct insurance business beyond Indiana borders. From approximately June of 1973 to April, 1978, Keystone sold group credit life and disability insurance directly to Indiana consumers. These "direct" policyholders of Keystone are not parties to this appeal.

In September of 1972, Central State Agency, Inc. (CSA), a Michigan corporation doing business as a general insurance agent,[4] entered into an Agent's Agreement with Foremost whereby CSA agreed to sell Foremost insurance products in states other than Indiana. CSA specialized in credit life and disability insurance.

On July 1, 1973, Foremost entered into the Treaty with Keystone, the gist of which is revealed by the following stipulations:

8. Under Article I of the Treaty, Foremost "ceded" (transferred) to Keystone credit insurance business originally generated by CSA for Foremost outside Indiana under the Agent's Agreement between CSA and Foremost. Keystone "accepted" as reinsurance Foremost's liability under such credit insurance. In other words, Keystone undertook financial and administrative obligations which Foremost had under its outstanding credit insurance certificates to the policyholders (consumers-debtors) of Foremost outside Indiana. Initially, Foremost collected the premiums paid by the policyholders (less CSA's agent's commission), kept for itself as a fee 2% of the net written premiums, and paid the remainder to Keystone. With that money, Keystone was to set up reserves, pay claims and litigation costs, and take care of administrative expenses. Later, CSA collected the premiums for Foremost, deducted CSA's agent's commission, paid Foremost the 2% fee, and paid the remainder to Keystone.

9. Foremost's policyholders were not formally informed of the Treaty or of Keystone's obligations to Foremost under the Treaty. Foremost remained legally liable to its policyholders under the credit insurance in the event Keystone failed to perform its obligations to Foremost under the Treaty. There is no privity of contract between Keystone and the Foremost policyholders.

Moreover, by the terms of the Treaty the liability of Keystone was to be identical with Foremost's liability on the original policies. Indeed, as characterized in Fore-

---

**3.** The parties have shown an exemplary amount of cooperation in preparing the record before us in order to facilitate our review. We recognize, of course, that the stipulations before us do not bind persons or entities not a party thereto. *See, e. g., Hawkins et al. v. Hawkins et al.,* (1974) 160 Ind.App. 5, 309 N.E.2d 177. Additionally, insofar as certain stipulations purport to foreclose issues of law, they are not binding on this court. *See, e. g., Yelton et al. v. Plantz, Trustee, Etc.,* (1948) 226 Ind. 155, 77 N.E.2d 895; *App et al. v. Class et al.,* (1947) 225 Ind. 387, 75 N.E.2d 543.

**4.** CSA became subject to involuntary bankruptcy proceedings in California on June 1, 1978.

most's brief, "Keystone was to step into the shoes of Foremost, administer the policies, and pay the claims due under them." App.Br. 24. It also appears that CSA and Keystone were controlled by the same individual(s).[5] The above scenario was principally designed, therefore, to enable Keystone to conduct insurance business in states other than Indiana.[6]

On April 24, 1978, the Department of Insurance of the State of Indiana (Department) filed an application for the rehabilitation of Keystone and, on the following day, the Department was awarded a court order to take over the assets of Keystone. When Keystone became unable to perform under the Treaty, Foremost began administering the policies and paying claims with their own funds. On October 31, 1978, an order of liquidation was entered. Thereafter, the court below determined that Foremost's damages due to Keystone's breach of the Treaty amounted to $2.5 million. These damages include claims and refunds already discharged by Foremost, actuarial claims that Foremost will presumably discharge in the future, administration expenses, premium taxes, and other miscellaneous items.

Reinsurance is a malleable concept that has proved troublesome for the courts since various distinct undertakings may come within the general meaning of the term.[7] For this reason, it is of paramount impor-

tance that a reinsurance agreement be stripped of the term "reinsurance" so that the true nature of the arrangement can be discerned. *See* 19 *Couch on Insurance* 2d § 80:46 (1968).

The peculiar attribute of the Treaty involved herein is that Keystone stepped into the shoes of Foremost by agreeing to indemnify Foremost 100 percent against liability and to assume all administrative responsibilies on the Foremost policies sold by CSA. It is widely recognized that where a reinsurer (Keystone) assumes responsibilities directly to the original consumers of the reinsured, such consumers may proceed directly against the reinsurer as third party beneficiaries. *See* 13A *Appleman Insurance Law and Practice* § 7694 (1976); *O'Hare v. Pursell*, 329 S.W.2d 614 (Mo. 1959); *Federal Life Insurance Company v. Barnett, Admx.*, (1919) 71 Ind.App. 613, 125 N.E. 522. Of course, Foremost remained liable as a joint obligor since it could not be relieved of its contractual duties to its insureds absent a novation. *See Appleman, supra* § 7755; *Couch, supra* § 80:61. Otherwise stated, from the point of view of the Foremost insureds, Keystone and Foremost were jointly liable. *See* Vance, *Handbook on the Law of Insurance* § 207, pp. 1071–2 (1951).

As between Keystone and Foremost, however, a quasi-suretyship arrange-

---

**5.** It appears that the instant rehabilitation proceedings were initiated by the Department of Insurance as a result of the involuntary bankruptcy proceedings against CSA inasmuch as the stockholders in both corporations were identical.

**6.** In Foremost's supplemental brief on page 2, it is stated:

Keystone was licensed to sell insurance only in the State of Indiana, so in order to conduct such business in the other states of the Union, except Hawaii and New York, Keystone contracted with Foremost Life Insurance Company to permit CSA to sell credit insurance in other states, and pay Foremost a fronting fee of 2% of the net premium; part of this arrangement included the Reinsurance Treaty . . . . .

And stipulation of fact number 11 states:

During the period 1973 to 1978, CSA or Keystone had agreements with the following insurance companies *to provide a national*

*market for their business:* . . . Foremost Life Insurance Company . . . .. [Emphasis added.]

**7.** For "true" reinsurance, *see* 13A Appleman *Insurance Law and Practice*, § 7681 (1976); *Gulf Insurance Company v. Kolob Corporation*, 404 F.2d 115 (10th Cir. 1968). Compare a reinsurance "treaty": 19 *Couch on Insurance* 2d § 80:2; *Appleman, supra* § 7681; *Pioneer Life Insurance Co. v. Alliance Life Insurance Co.*, 374 Ill. 576, 30 N.E.2d 66 (1940); *Security Mutual Casualty Company v. Century Casualty Company*, 531 F.2d 974 (10th Cir. 1976). "Bulk" reinsurance is defined in *Sierra Life Insurance Company v. First National Life Insurance Company*, 85 N.M. 409, 512 P.2d 1245 (1973). For "substituted" reinsurance, *see Appleman, supra* § 7741. We have concluded that the agreement herein cannot accurately be placed in any of the above "categories."

ment was created whereby Keystone was ultimately liable to discharge the claims of policyholders and Foremost acquired the status of a *surety*. This result obtains by analogy to those cases wherein a grantee assumes the mortgage indebtedness of the grantor/mortgagor to the mortgagee. Without the assent of the mortgagee, the assuming grantee and the grantor/mortgagor are principal debtors; however, as between the grantor and the grantee, the latter is the principal debtor and the former is a surety. *See, e. g., Gregory, Administratrix v. Arms*, (1911) 48 Ind.App. 562, 96 N.E. 196; *Black v. Krauss et al.*, (1949) 119 Ind.App. 529, 85 N.E.2d 647; *Todd et al. v. Oglebay et al.*, (1902) 158 Ind. 595, 64 N.E. 32; *Gross Income Tax Division, etc. v. Crown Development Company, Inc.*, (1952) 231 Ind. 449, 109 N.E.2d 426. Upon default by the assuming grantee and discharge by the grantor/mortgagor, the latter is subrogated to the rights of the mortgagee against the former. *Gregory, Todd, supra.*

■ Subrogation is a doctrine of pure equity (*Railroadmen's Building and Savings Association v. Rifner*, (1928) 88 Ind. App. 580, 163 N.E. 236), and is fundamentally premised upon the avoidance of unjust enrichment by he who in good conscience should discharge the debt. *Home Owner's Loan Corporation v. Henson et al.*, (1940) 217 Ind. 554, 29 N.E.2d 873.

> The right of subrogation is not founded upon contract, express or implied, but upon principles of equity and justice, and includes every instance in which one party, not a mere volunteer, pays a debt for another, primarily liable, and which in good conscience should have been paid by the latter.

*Warford et al. v. Hankins*, (1898) 150 Ind. 489, 493, 50 N.E. 468, 470 (citation omitted). As the mortgage assumption cases illustrate, the fact that the grantor/mortgagor

is primarily liable from the mortgagee's point of view does not preclude the right of subrogation, despite the fact that one primarily liable may not generally be subrogated after discharge of his own debt.[8] Where applicable, subrogation will clothe the subrogee with the priority status of the subrogor. *See Hubbard v. Security Trust Company, Receiver*, (1906) 38 Ind.App. 156, 78 N.E. 79. The rights of the subrogee, however, are not entitled to any *greater* rights than those of the subrogor. *See, e. g., Duncan, Administrator v. Gainey, et al.*, (1886) 108 Ind. 579, 9 N.E. 470.

■ With the foregoing principles in mind, we believe that Foremost is entitled to be subrogated to the rights of Foremost's insureds to the extent such insureds would have been entitled to a class three status upon Keystone's insolvency.[9] As noted in *Bushnell, supra*, insolvency constitutes a material breach of contract such that the insureds may recover either unearned premiums or covered losses accruing prior to insolvency. From the record before us, it does not appear that Foremost elected to cancel any outstanding policies so no unearned premiums were returned, and thus no recovery may be had therefor. Foremost did, however, discharge claims arising prior to insolvency and it is to that extent subrogated to the class three status of the insureds.

■ We hasten to add, however, that inasmuch as subrogation is an equitable doctrine, its application is always dependent upon the facts and circumstances of each particular case. *Vonderahe, Executor, etc. v. Ortman et al.*, (1958) 128 Ind.App. 381, 147 N.E.2d 924. It is uniformly recognized that a court of equity must consider the legal and equitable rights of third persons in permitting subrogation *in order to ensure that subrogation will not prejudice other rights of equal or superior rank.* 73 Am.

---

8. *See also Birke et al. v. Abbott et al.*, (1885) 103 Ind. 1, 8, 1 N.E. 485, 489 ("Subrogation takes place only where one has performed the obligation of another, *or has paid his own debt, the burden of which has, for a valuable consideration, been assumed by another* . . . .. (Emphasis added.)

9. As third party beneficiaries, the Foremost insureds would clearly be "policyholders, beneficiaries, and insureds" of Keystone since Keystone's liability under the Treaty was *identical* with Foremost's liability to its insureds.

Jr.2d *Subrogation* §§ 15, 17 (1974); 83 C.J.S. *Subrogation* § 6d (1953).[10] Therefore, the Keystone direct policyholders that have a class three status are entitled to full satisfaction; thereafter, the class three claim of Foremost will be entitled to recognition.

▪ The other monetary claims of Foremost are not entitled to class three priority since they are unrelated to the rights of the subrogor. Administration expenses, premium taxes, *et cetera*, are claims peculiarly related to the costs of doing business as a result of Keystone's insolvency. The actuarial claims of Foremost based on the anticipated future discharge of liabilities to Foremost's insureds amount to aggravation of damages and speculation, inasmuch as the rights of the insureds were for all intents and purposes fixed upon liquidation. *Bushnell, supra.*

▪ We are not persuaded by the contentions of Foremost that it is an "insured" or a "policyholder." Foremost argues that the Treaty constitutes "insurance" as defined in IC 27–1–2–3(a), because ". . . in consideration of a price paid, adequate to the risk, [Keystone] became security to Foremost against loss by certain specified risks; namely, the risks stated in the Reinsurance Treaty." App.Br. 32. The plethora of contractual arrangements that may constitute "insurance," however, is merely a threshold matter to the inquiry of whether a party is within the protection of IC 27–1–4–15(3). Therefore, even assuming the Treaty was in the nature of insurance, it is further incumbent upon Foremost to show it was an insured, policyholder or beneficiary within the intention of the legislature.

▪ Foremost contends that inasmuch as Keystone was labeled the "reinsurer" and Foremost the "reinsured" under the Treaty, Foremost was an "insured" within the meaning of IC 27–1–4–15(3).[11] Alternatively, Foremost argues that it is a "policyholder" since the Treaty constituted a "contract of insurance." We believe these arguments lack merit. It is the province of the courts to ascertain and give effect to the intent of the legislature, and ascribe to the language used its ordinary and usual meaning. *Jenkins v. Stotts*, (1976) Ind.App., 348 N.E.2d 57. Naturally, we must examine the language employed by the legislature (*City of Muncie, et al. v. Campbell*, (1973) 156 Ind.App. 59, 295 N.E.2d 379), and every word and clause should be given effect if possible. *Marhoefar Packing Company, Inc. v. Indiana Department of State Revenue*, (1973) 157 Ind.App. 505, 301 N.E.2d 209. Lastly, it is appropriate to consider the grammatical structure of the clause or sentence in issue. *See City of Indianapolis v. Ingram*, (1978) Ind.App., 377 N.E.2d 877.

▪ The priority statute protects the claims of insureds and policyholders "arising from . . . contracts and policies *issued* by the company . . . ." (Our emphasis.) The Treaty herein was not, in our opinion, *"issued"* by Keystone as that term is generally understood. Rather, the Treaty was an arms length contractual arrangement which had as a dominant purpose a purely business oriented goal, to-wit: the right of Keystone to do business in states other than Indiana.

▪ A contract or policy of insurance is "issued" because it is essentially unilateral in nature—upon the happening of a fortuitous occurrence, the carrier promises to pay. Typical policies or contracts of

---

**10.** A surety cannot by subrogation share ratably with unsatisfied members of a class intended to be benefited by the surety's bond (even though the surety has extinguished its liability thereon) in the bankruptcy assets of the insolvent principal. *American Surety Co. v. Sampsell*, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663 (1946). This case supports the proposition that when a class of creditors is entitled to protection, a surety by virtue of subrogation may not *decrease* such protection by sharing ratably with creditors of equal rank who have yet to receive satisfaction.

**11.** As noted previously, the reinsurance "label" is not controlling. Courts must cautiously proceed in light of the various usages of reinsurance in order to prevent the application of form over substance.

insurance contain several standardized clauses that are not dickered terms. The insured or policyholder duties are not promissory in nature. Such duties are generally articulated as conditions rather than covenants. When this is the case, as in a typical consumer transaction, the term "issued" is particularly apropos. Conversely, a reinsurance treaty is generally a bilateral contract with mutual covenants. *See Security Mutual Casualty Company v. Century Casualty Company*, 531 F.2d 974, 977 (10th Cir. 1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137.[12] As the various usages of reinsurance agreements attest, the process of negotiation is an integral part of any such arrangement. Therefore we hold that where, as here, an "insurance" arrangement is clothed with a dominant business purpose and is founded upon a bilateral contract that has been tailored to the relative positions of the parties, it is not a contract or policy of insurance *issued* by the insolvent carrier.

■ We also reject Foremost's contention that it should be treated as a guaranty association. In the stipulations of fact, the parties stated:

13. Generally, a guaranty association is a statutorily-created entity made up of insurers doing business in the state where the guaranty association is created. The guaranty association is typically governed by a board of directors elected by member insurers. The purpose of the guaranty association is to guarantee to the public that if a member insurer becomes insolvent, the guaranty association will step in and see that policy obligations of the insolvent insurer are paid. If that becomes necessary, members of the guaranty association are assessed and must pay the necessary amount to see that policyholders are not hurt by a member insurer's insolvency.

14. Indiana has had a guaranty association for casualty insurance since the Indiana Insurance Guaranty Association Law of 1971, *Ind.Code* § 27-6-8-1, *et seq.* However, it was not until September 1, 1978, approximately 4 months after the Keystone rehabilitation proceeding began, that Indiana had a guaranty association for life and disability insurance of the type written by Keystone. *See Ind. Code* § 27-8-8-1, *et seq.* The Indiana direct policyholders of Keystone are not protected by any Indiana guaranty association. Had *Ind.Code* § 27-8-8-1, *et seq.* been in effect when Keystone became impaired, the Indiana direct policyholders of Keystone would have been protected by the Indiana Life and Health Insurance Guaranty Association created by *Ind.Code* § 27-8-8-3. The policyholders of Foremost, whose certificates were reinsured by Keystone under the Treaty, are not entitled to any protection under the Indiana guaranty association statute. *See Ind.Code* § 27-8-8-1(b)(3).

As the stipulations reveal, had a guaranty association been applicable to this insolvency proceeding, the Foremost insureds would not have been protected thereby. IC 27-8-8-1(b)(3). By discharging obligations that would not have even been imposed on a guaranty association, Foremost is nevertheless claiming the preferred status of a guaranty association. This contention must fail. The legislature obviously intended a guaranty association to be protected by discharging certain obligations, but not from the discharge of any and all obligations of an insolvent carrier. Accordingly, we fail to discern a legislative intent to protect Foremost herein when the very obligations discharged by Foremost were never imposed on guaranty associations.[13]

■ As part and parcel of its argument, Foremost quotes the following from the 1976 report of the Proceedings of the Na-

---

12. *Compare Pioneer Life Insurance Co. v. Alliance Life Insurance Co.*, 374 Ill. 576, 588, 30 N.E.2d 66, 72 (1940) (". . . treaties are neither 'issued' nor 'assumed' but are 'made.' ")

13. We also note that members of a guaranty association become responsible, upon insolvency of a member, by virtue of their membership in the association, and not on the original contracts or policies of insurance.

tional Association of Insurance Commissioners, Vol. I, p. 321:

B. *Priority Status for Policyholders and Claimants, Including Guaranty Funds.*

The drafting task force and industry advisory committee believe that all policyholders and claimants, including the guaranty funds, should be placed in a priority status higher than that of general creditors. General creditors include commercial interests which assume the business risk of selling products or services to a potentially insolvent insurer. This same business risk is assumed whether the commercial interest sells the product or service to an insurer or some other business entity. On the other hand, individual policyholders and claimants purchase insurance for financial security. Commercial interests do not expect any particular security when providing products or services to an insurer which might become insolvent. Also, commercial interests selling to an insolvent noninsurance entity would be treated as general creditors upon the insolvency of such noninsurance entity. He should not receive the preference of being placed with policyholders and claimants when it is an insurance company insolvency. It must be remembered that the greater the assessments by guaranty funds against insurers in order to obtain moneys to pay policyholders and claimants, the greater the increase in voluntary insurers' rates. To the extent that the guaranty funds are placed in a higher priority than general creditors, and thereby receive a greater amount of money than would have been received had the guaranty fund been in the same priority as general creditors, such savings will be passed on and policyholders of other insurers will be required to pay a lesser amount for the insolvency.

It should be noted that the proposal not only places the guaranty funds ahead of general creditors, but places all insurance claims (first and third party) and unearned premium claims ahead of general creditors' claims. This means that while the guaranty funds will be in a priority ahead of general creditors, so will claimants who have claims under certain kinds of insurance not covered by the guaranty fund laws and that portion of any claim not covered by the guaranty fund (deductibles and claims in excess of the maximum amount covered by the guaranty fund).

Fresh money contributed by policyholders through their companies to guaranty funds to pay policyholders and claimants of an insolvent company should have a claim higher than that of general creditors because policyholders are required by law to infuse this money; whereas, the general creditors voluntarily deal with the company.

Therefore, the drafting task force and industry advisory committee recommend that the following be inserted in the priorities section of each state's insurance law, immediately above the general creditors section:

Claims by policyholders, beneficiaries, and insureds arising from and within the coverages of and not in excess of the applicable limits of insurance policies and contracts issued by the company, and liability claims against insureds which claims are within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company, and claims of the [(state) Insurance Guaranty Association] and the [(state) Life and Health Insurance Guaranty Association] and any similar organization in another state.

Foremost has not directed us to any legal authority which purports to infuse the above commentary with probative life. Nor was it duly entered into the record. Thus, we find ourselves in somewhat of a quandary as Foremost relies heavily on the quoted commentary, but the same has not been properly presented to this court. On the one hand, this argument should proper-

ly be deemed waived. But we have an express judicial preference for deciding appeals on the merits, and therefore proceed to address Foremost's argument.

 This court has looked for guidance in understanding the probate code to study commission comments. *Lewis et al. v. Estate of Smith etc.*, (1959) 130 Ind.App. 390, 162 N.E.2d 457. Our supreme court has also recognized that in case of ambiguity it is permissible to consider the notes of the Commissioners of Uniform Laws. *Eads et al. v. J. & J. Sales Corp.*, (1971) 257 Ind. 485, 275 N.E.2d 802. Similarly, testimony by the drafters of legislation may be relevant and useful in ascertaining the intent of the legislature. *Indiana Aeronautics Commission v. Ambassadair, Inc.*, (1977) Ind., 368 N.E.2d 1340, *cert. denied*, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403. No case has held, however, that such advisory comments are conclusive; in fact, we have held that the judicial study commission comments to our rules of procedure are not binding. *Sowders v. Murray et al.*, (1972) 151 Ind. App. 518, 280 N.E.2d 630. Therefore, even were we to accept Foremost's interpretation of the above commentary, we would not be bound thereby in ascertaining the legislature's intent.

But, we believe the commentary militates against, rather than supports, the argument of Foremost. With respect to guaranty funds, the commissioners intended protection to be afforded because *fresh* money was being contributed to the fund by policyholders of member insurers. Inasmuch as these contributions are required by law, the grant of priority to the guaranty fund will reduce the amount the policyholders of *other* insurers will have to pay. In this case, however, Foremost voluntarily entered into the Treaty with Keystone, and no "fresh" monies were infused—there was but one premium that was divided by Foremost and Keystone. The commentary, therefore, clearly negatives the notion that Foremost is akin to a guaranty fund. If Foremost was given a priority, it would be benefitted, but the benefit would not run to the policyholders and insureds of other carriers that had contributed fresh .money to discharge the obligations of an insolvent insurer.

Only the latter interests were intended by the commissioners to be protected as a guaranty fund.

Secondly, we do not ascribe to Foremost's construction that the commissioners intended to protect *all* "insurance" interests as that term may be broadly defined. The proposal recited above was drafted by the Insurance Guaranty Funds Subcommittee. The task force had been charged with the responsibility of (1. developing recommendations concerning the desirability and methods for permitting guaranty associations immediate access to the assets of the insolvent carrier in order to minimize assessments, and (2. developing proposals which would enable guaranty associations to claim a statutory priority above general creditors. NAIC Vol. I, p. 319 (1976). It is obvious that the task force was fundamentally concerned with the limited and specialized problem of protecting statutory guaranty associations, and the concomitant benefit running to those who had contributed fresh money. As such, the expansive interpretation urged by Foremost is simply without foundation.

Moreover, the commissioners clearly evinced the intent that commercial or business interests should not be given a priority merely because the transaction involves an insurance company that goes insolvent. As we have repeatedly noted, a dominant goal of the Treaty was business oriented—Keystone acquired the right to do business in states other than Indiana. In this respect, Foremost accepted a business risk not entitled to protection. And, as also stated previously, Foremost is exalting form over substance in claiming the status of an insured or a policyholder—the Treaty created a quasi-suretyship arrangement. We fail to discover an intent to place Foremost on the same plane as original consumers in the commissioners' report. Therefore, the argument of Foremost based on the commissioners' report is not persuasive.

We reverse and remand for further proceedings not inconsistent with the views expressed herein.

LOWDERMILK, P. J., and LYBROOK, J., concur.