STATE EX REL. MAVITY v. TYNDALL ET AL.

[No. 28,167. Filed May 24, 1946. Rehearing denied July 1, 1946.]

*Earl J. Wynn,* of Indianapolis, for appellant.

*Arch N. Bobbitt,* Corporation Counsel, and *Henry B. Krug,* City Attorney, both of Indianapolis, for appellees.

RICHMAN, J.—May a citizen who has been acquitted of a misdemeanor compel the surrender or destruction of his fingerprints, photographs and other identifying records made by city police officers at the time of his arrest? The trial court gave a negative answer to

this interesting question by sustaining a demurrer to his complaint. Judgment for failure to plead over was followed by this appeal.

Though titled and verified as a *mandamus* action nevertheless the 10 paragraphs of complaint may have been treated below as a suit in equity. The judgment was not against the plaintiff but against "the plaintiff, John L. Mavity." He was the real party in interest. See *City of Indianapolis* v. *Central Amusement Co.* (1918), 187 Ind. 387, 119 N. E. 481. Appellees are named as individuals but their liability, if any, is as officials—Mayor, Board of Public Safety, and former and present Chief of Police—of the City of Indianapolis, and as such doubtless they were intended to be charged. In this respect they have not challenged the complaint.

The essential facts averred are that Mavity, hereinafter called appellant, is 46 years old, married, employed as a locomotive engineer and fireman and has been a resident of Indianapolis for many years. Aside from a traffic violation he had never been charged with any criminal offense until January 27, 1944, when early in the afternoon while conducting himself in an orderly manner on a public street he was arrested, taken to the headquarters of the Indianapolis Police Department and "slated" on two misdemeanors, gaming and keeping a gaming device. At that time against his will his fingerprint impressions were made in triplicate. He was photographed with a card, on which there were certain numbers, placed across his chest. His signature was taken and a personal description added. One set of these records was sent to the Indiana State Police, another to the Federal Bureau of Investigation at Washington, D. C., and the third retained and filed at police headquarters in Indiaanpolis. A few days later, after a hearing, the charges were dismissed. He then

demanded the return of the data on file with the Indianapolis Police Department and that its officers obtain the return of the copies sent to the Federal Bureau of Investigation and the Indiana State Police.

1. He avers that

"It is the common practice . . . to maintain at the Indianapolis Police Department what are commonly known as 'rogue's galleries,' in which are placed, for public exhibition, the photographs of persons arrested . . . being those of males and females, old, senile, middle aged, and young; the guilty and the not guilty; first offenders and hardened criminals; irresponsible citizens and transients, on the one hand, and responsible and law abiding citizens, on the other, who, through no fault of their own have fallen into the toils of the Indianapolis police department, and then found not guilty by a court of competent jurisdiction."

It is not charged directly, but may be inferred, that his picture was put or intended to be put in such a gallery. He complains that exhibition of his photographs and his fingerprint impressions as a part of the criminal records injures his reputation and causes him humiliation and mental suffering. There is an allegation charging violation of Art. 1, § 16 of the Constitution of Indiana, relating to cruel and unusual punishment, which we dismiss as inapplicable. He sets out certain rules of the Indianapolis Police Department requiring fingerprinting and photographs of persons suspected of felonies and who have criminal records, but none applying to persons arrested for misdemeanors. The relief requested includes return to him or the destruction of all the identification records above mentioned in the possession of the Indianapolis Police Department, orders against appellees to request the return of what was sent to the Indiana State Police and the Federal Bureau of Investigation, and a negative injunc-

tion against "keeping in the said police files" and against "continuing their request that the Federal Bureau of Investigation, Washington, D. C., and the Indiana State Police, Indianapolis, Indiana, keep and file" said data.

When the practices complained of were begun or by what authority, except as stated in the rules above referred to, does not appear. It may be assumed, however, that police officers making arrests in Indianapolis take such data pursuant either to direct orders of their superiors or to an established custom, since an identification department is ordinarily deemed essential to the operation of any modern metropolitan police system. It is not charged that appellant was the victim of a variation from usual procedure. In fact, the quotation from the complaint indicates that every one taken into custody by the Indianapolis police is required to submit to photographing and, we may assume, fingerprinting.

Since municipal government in Indiana is of statutory creation, it follows that operation of a city police department requires legislative authority. Undoubtedly the General Assembly might prescribe in detail means and methods for conducting the Indianapolis Police Department. But the legislature has not chosen to do more than authorize in general terms the Board of Public Safety to establish, regulate and operate a police system. §§ 48-6101, 48-6102, Burns' 1933. In such operation we think it is quite clear that the board, chief of police and other police officers are exercising an administrative function of the executive branch of the government, for the obligation and power to enforce the laws is executive, rather than legislative. In the absence of statutory direction or regulation the power to maintain and operate a city police system car-

ries with it the right and duty to exercise reasonable discretion in such maintenance and operation. Courts should be cautious about interference with such an executive discretion.

The legislature undoubtedly has the power by statute to declare a public policy binding upon a city police department even though the statute does not purport to regulate city police activities. The only Indiana statutes that deal with the right to fingerprint and photograph for police purposes are found in ch. 344 of the Acts of 1945, p. 1622, establishing the State Police Department. Under § 11 thereof and the 10 following sections a "Bureau of Criminal Identification and Investigation" is created and the powers and duties of its personnel prescribed. The members of the State Police force are required to fingerprint and photograph persons arrested for serious offenses and have the discretion to do so in arrests for misdemeanors. § 47-865, Burns' 1933 (Supp.). The Act puts no obligation upon city police departments, sheriffs and similar peace officers except to require their cooperation with the Bureau "in establishing and maintaining an efficient and coordinating system of identification." § 47-858, Burns' 1933 (Supp.). Without reciting in detail other provisions of the Act it is sufficient to say that the public policy manifest in its directives to members of the State Police force permits city police authorities to exercise a similar discretion in arrests for misdemeanors. There is no suggestion in the Act that identification data having once been obtained shall be surrendered or destroyed. They are to be filed as a part of the "coordinating system of identification." Filing implies retention.

As to the making of the fingerprints and photographs appellant concedes that the arresting officers were with-

in their rights. This is the modern rule which the frequently cited cases of *State ex rel. Bruns* v. *Clausmeier* (1900), 154 Ind. 599, 57 N. E. 541, helped establish. Appellant contends, however, that the language of that case excludes any right of police officials to retain the prints and pictures. In other words, he argues that they are for but two uses, the prisoner's identification and safekeeping pending trial and to aid in his recapture if he escapes and that after acquittal they are not needed by the peace officers and should either be destroyed or surrendered. He bases his claim to such relief upon his right of privacy.

The right of privacy is supported by logic and the weight of authority. The cases and most of the law magazine articles on the subject are cited and epitomized in an exhaustive and analytical note in 138 A. L. R. 22 (1942) in which the author, R. T. Kimbrough, shows the development of the doctrine from its origin (1890) in the "classic article" by Samuel D. Warren and Louis D. Brandeis entitled The Right To Privacy. 4 Harvard Law Rev. 193. Since Mr. Kimbrough's note was written, a few cases have added to the literature on the subject, including *Barber* v. *Time, Inc.* (1942), 348 Mo. 1199, 159 S. W. (2d) 291; *Cason* v. *Baskin* (1944), 155 Fla. 198, 20 So. (2d) 243; and several New Jersey cases hereinafter discussed. See also *State ex rel. Reed* v. *Harris* (1941), 348 Mo. 426, 153 S. W. (2d) 834, decided about the time when Mr. Kimbrough's note was written.

Most of the law of privacy was developed as the result of intrusion for news or commercial purposes into the private affairs of the complainant. Comparatively few decisions involve police identification practices. The cases are collected in *McGovern* v. *VanRiper* (1945), 137 N. J. Eq. 24, 43 A. (2d) 514, upon which

appellant strongly relies. A New Jersey statute requires, immediately upon arrest for an indictable offense, the taking of fingerprints and photographs and the forwarding of copies to the State Bureau of Identification. McGovern, a sheriff, failed or refused to comply with this statute. See the companion case of *Jenkins* v. *McGovern* (1945), 136 N. J. Eq. 563, 43 A. (2d) 526, reversed on appeal, 45 A. (2d) 844. Indictment of McGovern followed. Before his arrest he procured a restraining order preventing the taking and forwarding of his own fingerprints and photographs. Vice Chancellor Kays after hearing modified the order to permit the taking but forbade the "dissemination" of the identification data prior to McGovern's conviction unless he "become a fugitive from justice." He unsuccessfully appealed from that part of the order permitting the taking. 45 A. (2d) 842. The remainder of the order was not involved in the appeal. So, as to the ruling in which we are interested, the highest court of New Jersey has not spoken since the Bartletta cases referred to in Vice Chancellor Kays' opinion.

In this opinion the Vice Chancellor, aware of the fact that in New York the common-law right of privacy is not recognized, nevertheless, relies on numerous New York cases to reach his conclusion. We do not regard them as applicable since in that jurisdiction legislation is the source of the right and remedy. Upon the absence of legislation is based the case of *Matter of Molineux* v. *Collins* (1904), 177 N. Y. 395, 69 N. E. 727, 65 L. R. A. 104, cited by appellees. In that case photographs and Bertillon measurements were described as public records taken pursuant to a mandatory statute and as such records not subject to surrender or destruction without a similar mandate. Where, as in the present case, fingerprints and photographs are made

in the exercise of an executive discretion and not pursuant to legislative order it would seem that the authority to take would imply the authority to surrender or destroy.

Turning again to the opinion of Vice Chancellor Kays it is apparent that the only way by which he could escape the legislative mandate for immediate forwarding of identification data was to declare the statute unconstitutional. To reach this conclusion he was required to put the right of privacy beyond the control of the legislature. He said:

> "It is now well settled that the right of privacy having its origin in natural law, is immutable and absolute, and transcends the power of any authority to change or abolish it."

This view is not shared by other writers on the subject and seems to us unsound. Privacy is not an absolute right, at least in the sense that it is always superior to the rights of the public. Mr. Kimbrough says, 138 A. L. R. 45:

> "In every case involving an assertion of a right of privacy, the court is called upon to resolve a conflict between the rights of the individual on the one hand and the interests of society on the other."

The Florida Supreme Court in *Cason* v. *Baskin, supra,* says:

> "But the right of privacy has its limitations. Society also has its rights."

In *Barber* v. *Time, Inc., supra,* it is said:

> "Nevertheless, under our form of governments, citizens have duties and obligations to the community and society as well as rights. In order to preserve rights for himself one must aid in preserv-

ing them for all. This requires cooperation with others. No one is entitled to or can have complete isolation. Individual rights must be construed in the light of duties incumbent upon individuals as citizens of a free country."

And again:

"Thus, establishing conditions of liability for invasion of the right of privacy is a matter of harmonizing individual rights with community and social interests."

In 1941 Louis Nizer in a frequently cited article entitled "The Right of Privacy, A Half Century's Developments," 39 Mich. Law Rev. 526, 529, made these statements:

"Frequently, the public has an interest in an individual which transcends his right to be let alone. Since the whole is greater than its component parts, private rights must often yield to public interest. . . .

"In any single case these two opposing forces press in upon the judge. On the one hand, he is urged to uphold the right of free speech, the right of society to know the truth, the right to make full use of the wonders of modern civilization which spread intelligence instantaneously to the farthest ends of the earth. On the other hand, he is urged to protect the sensibilities of the individual from the brash and vulgar attentions of the mob, to fence off a small corner of human existence against the predatory advances of selfish commercial interests. Thus, every lawsuit based upon an alleged infringement of the right of privacy poses a dilemma in which the court is called upon to find a point where the rights of the individual and the rights of society are in equilibrium; a succession of such points constitutes the line in which the privacy doctrine has progressed."

To this we add that the more complex the civilization, the more troublesome the problem of resolving such a

conflict of interests and the less likely when the public safety is involved that the individual's right will be found to be dominant.

A court of equity is an appropriate forum for ascertaining this "point" of "equilibrium." If such a court may balance equities between private litigants (See McClintock on Equity, § 140) it ought to be able to balance the private and public interests and reach a conclusion on the particular facts as to the dominant right. There certainly is no such clear right in appellant or duty upon appellees as to authorize a writ of mandate. See *State ex rel. Spindler* v. *Scheiman* (1913), 179 Ind. 502, 101 N. E. 713; *State ex rel. Hammond* v. *Foland* (1921), 191 Ind. 342, 132 N. E. 674. The cases cited to the contrary by appellant are not in point.

The right of privacy is essentially personal though some courts have labored and found that it entails a property right. See *Munden* v. *Harris* (1911), 153 Mo. App. 652, 658, 134 S. W. 1076, 1078. Without quibbling over its character we hold that it is protectable in a court of equity. See cases cited in 138 A. L. R. 108. This must be true in the present controversy for there is no adequate remedy at law. The Supreme Court of Missouri has so stated in *State ex rel. Reed* v. *Harris, supra,* wherein it denied a writ of prohibition to prevent the prosecution of a suit quite similar to the one at bar. The court said:

> "We are satisfied that an action at law for damages would not be an adequate remedy. The damage, if any, flowing from the display of an innocent person's photograph in Rogue's galleries throughout the country, is or might be a continuing one, and not capable of any fair estimation or measurement by a money judgment. The remedy at law would be incomplete, less prompt and less

efficient than resort to equitable relief, and, hence, would not constitute a bar to the latter."

An additional reason in the present case is that appellees are public officers performing a governmental function. We therefore conclude that the question posed in the first sentence of this opinion may be and is properly raised by the complaint treated as a bill in equity. So treated does it require us to resolve against appellant the conflict between his right and the public interest? If so the judgment should be affirmed.

Appellant really complains of publicity, the antithesis of privacy. What publicity has he already had? What more will be given if the identification data are retained? When he was arrested he was "slated." We assume that this included a statement on police records that he had been arrested on a certain date and charged with a certain offense. There followed entries on a court docket of the filing of an affidavit, a plea, a hearing and a judgment dismissing the charge. These records are extant. He does not ask that they be blotted or torn out of the books in which they are contained. But any one may read them for they are public records. His fingerprints, if they are to be of any value to the police, must be filed in a cabinet and indexed in such a manner that they may be found by one who is qualified to read them. So filed they tell nothing to the idle curious whose gossip might hurt his reputation. They are available and valuable only to the expert searching for criminals and concerned enough, we may assume, to inform himself as to the court's disposition of appellant's case and the final entry of acquittal. How can this harm appellant?

The actual taking of fingerprints under ordinary circumstances is not an indignity. In modern maternity

hospitals babes and their mothers are finger-printed to insure that the right baby goes home with its mother. Every person in the armed services, applicants for passports and for licenses of various kinds, employes of many large corporations, millions of persons in the United States have finger-prints in some public or private set of files. So long as they are kept there they are harmless. Accordingly, we can see no valid reason for their surrender or destruction by the police. At least none so compelling as to justify our substituting a judicial discretion for the executive discretion permitted by the absence of restrictive legislation. For this position there is sup-port in the opinion of Vice Chancellor Bigelow in *Fernicola* v. *Kennan* (1944), 136 N. J. Eq. 9, 39 A. (2d) 85. Its brevity permits quotation in full:

"Complainant, in 1940, was arrested on a charge of assault and battery, taken to police headquart-ers in Newark, where he was fingerprinted, meas-ured and photographed. The charge against him was promptly presented to the grand jury but no indictment was returned and the bill alleges that he was innocent. His identification papers remain in what is popularly known as the Rogues' Gal-lery and copies are on file in the offices of the prosecutor and of the sheriff of Essex County with similar records of criminals. Complainant feels that this is a great disgrace, and fears that he may thereby be prejudiced in obtaining employment and may suffer financial loss. He prays that the public officers concerned be decreed to surrender the photographs, negatives, measurements and finger-prints. The defendants move to dismiss the bill.

"A statute enacted in 1930, requires law enforce-ment officers immediately upon the arrest of any person for an indictable offense, to take his finger-prints and to forward copies of the same, together with photographs to the State Bureau of Identi-fication. Even before the statute, it was lawful for the police to fingerprint, photograph and measure

a person under arrest. *Bartletta* v. *McFeeley*, 107 N. J. Eq. 141; 109 N. J. Eq. 241. But neither the statute nor the cited decision deals with the retention of these records after the accused has been acquitted or when the lapse of time prevents prosecution.

"The taking of the fingerprints in the first place and the whole process of arrest of a possibly innocent person are a humiliation to which he must submit for the benefit of society. To the same end, the police are justified in retaining such records, in certain cases, after an acquittal or a failure of the grand jury to indict. Sometimes a grand jury dismisses a charge because it seems trivial; sometimes the trial jury must acquit a guilty person because the evidence does not establish guilt beyond a reasonable doubt. In every large community are men who have never been convicted of an indictable offense but whose associations and manner of life are such that the police feel reasonably assured that such a one, unless he turn over a new leaf, will eventually be guilty of a serious crime. If he be lawfully arrested and fingerprinted, the police are justified in keeping the prints for possible use in the future, even though no indictment is found. On the other hand, when a man of good repute has a false charge made against him and is cleared of it, it seems to me that the police should destroy his fingerprints and photograph, or remove them from the rogues gallery. But in the absence of statute, discretion in the matter belongs to the police. Since they are responsible for our safety, it is for them to decide whose identification papers will be apt to assist them in the performance of their duty. It is not for the court to make the decision. For these reasons, the bill will be dismissed. For cases from other jurisdictions, see *83 A. L. R. 129* and *138 A. L. R. 89.*"

It is apparent that to Vice Chancellor Bigelow the police practice most objectionable is the exhibition of an innocent man's picture in a "rogues' gallery." This appears also in *State ex rel. Reed* v. *Harris*. See quotation, *supra*. So also in the companion

cases, *Schulman* v. *Whitaker* (1906), 117 La. 704, 42 So. 227, 7 L. R. A. (N. S.) 274; and *Itzkovitch* v. *Whitaker* (1906), 117 La. 708, 42 So. 228, which were among the earliest cases giving injunctive protection of the right of privacy against police identification methods. Likewise *Downs* v. *Swann* (1909), 111 Md. 53, 73 A. 653, 23 L. R. A. (N. S.) 739, 134 Am. St. Rep. 586. The Louisiana cases concerned only photographs. The court would not permit them even to be taken though the two dealers in' second-hand goods had frequently clashed with the police. Of Itzkovitch the court said:

> ". . . it does not appear that he has ever been convicted, and before conviction his picture should not be *posted* (our emphasis) for then it would be a permanent proof of dishonesty."

In the Maryland case the lower court dissolved a preliminary injunction obtained by Downs against fingerprinting and photographing before trial. Denial of injunction relief was based on the fact that the complaint did "not allege the existence of a custom to put the photographs of unconvicted persons in the 'rogues' gallery' or charge the defendants with a purpose to put Downs' picture there . . . ." In affirming this ruling the Supreme Court concluded that taking and preserving photographs and Bertillon measurements did not violate the defendant's rights but added that:

> ". . . we must not be understood . . . to countenance the placing in the 'rogues' gallery' of the photograph of any person, not a habitual criminal, who has been arrested but not convicted on a criminal charge, or the *publication* (our emphasis) under those circumstances of his Bertillon record."

In practically all the cases we find this emphasis upon "posting," "publication," "exhibition" in a public place

called the "rogues' gallery." Without such a public display or manifest purpose to place an innocent complainant's photograph in juxtaposition with those of hardened criminals, we wonder if the courts would have felt justified in interfering by injunction. The Maryland courts did not. Vice Chancellor Bigelow, though he personally would have destroyed the photographs or removed them from the "rogues' gallery," by his ruling permitted the police to exercise their discretion in the matter.

What is a "rogues' gallery"? The kind that the Louisiana court had in mind may no longer exist. At least it is not the kind that appellant has described and that is the one with which we must deal. If it actually exists its character is a mater of proof. He says (quotation *supra*) that it contains the pictures of every one who has "fallen into the toils of the Indianapolis police department," or, in less irritating language, who has been arrested. If this be true we would expect the pictures of the acquitted to far outnumber those of the guilty. But a visitor, brought there for the purpose of identifying some one by whom he had been molested, might conclude that all the pictures were of criminals, though one acquainted with the system would know better. Whether names, or merely numbers, appear on the photographs is not alleged. At least his bears a number. And this is not a pleasant thought for one conscious of his complete innocence of crime. Is the placing of appellant's picture in the "rogues' gallery" described in the complaint so serious a violation of appellant's right of privacy as to justify judicial protection? Most of the cases so hold and we are constrained to follow them. The allegations of the complaint present a *prima facie* case. Complete answer,

of course, depends, upon the evidence. It follows that the demurrer was erroneously sustained.

Each of the last nine paragraphs of the complaint incorporates by reference parts of the first or some other paragraph. We have looked at the complaint as a whole and decided only one issue stated therein for the appellant. One paragraph would have presented his case. Asking too much relief does not prevent the granting of that to which he is entitled. We have eliminated the remedy of *mandamus*. By amending his complaint the issues for trial may and should be more simply and clearly stated.

On the facts alleged in the present complaint he is entitled (upon proof) only to an injunction against the exhibition of his photograph in the "rogues' gallery" above described. As long as the photographs are filed away from public gaze they would seem to be in the same category as the filed fingerprints. There is no occasion for a mandatory injunction. He does not charge that the Indiana "Bureau of Criminal Identification and Investigation" maintains a "rogues' gallery." If it does it cannot be restrained in this proceeding for lack of proper parties. Any relief from such exhibition by the Federal Bureau of Investigation ought first be sought by application to the Bureau. If there has been no change in the instructions of the Attorney General referred to in *United States* v. *Kelly* (1932), C. C. A. 2d, 55 F. (2d) 67, 83 A. L. R. 122, 127, he should have no difficulty in obtaining the copies sent to the Bureau by appellees.

We add one further word of caution. There may arise exceptional cases presenting facts that justify the surrender or destruction not only of photographs but also of fingerprints. Those cases should be decided upon their peculiar facts by

a trial court, balancing the complainant's right of privacy against the public interest. We ought not make an anticipatory ruling on any hypothetical state of facts. Suffice it that the complaint before us suggests no such exceptional case.

Judgment reversed with instruction to overrule the demurrer to the complaint.

NOTE.—Reported in 66 N. E. (2d) 755.