401 N.E.2d 1362 (1980)
Eugene GALLAGHER, Chief of Police, Indianapolis Police Department, Merrill Lowry, Ph.D., Director-Department of Public Safety, Defendants-Appellants,
v.
MARION COUNTY VICTIM ADVOCATE PROGRAM, Inc., Plaintiff-Appellee.
No. 2-777-A-292.
Court of Appeals of Indiana, Fourth District.
March 24, 1980.
Rehearing Denied April 24, 1980.
*1363 Sheila S. Suess, Corp. Counsel, City-County Legal Div., Stephen Goldsmith, Chief Trial Deputy, Corp. Counsel, Indianapolis, for defendants-appellants.
Susan R. Porter, Indianapolis, for plaintiff-appellee.
YOUNG, Judge.
The Marion County Victim Advocate Program, Inc. [MCVAP] brought this mandamus action in the Marion Superior Court to compel access to certain Indianapolis Police Department reports known as DHC's.[1] The DHC's are reports made by an officer who is called to the scene of a crime, accident or other incident which detail the location, time and description of the incident and include the names of any victim, witness or suspect.
MCVAP is a private Indiana corporation the sole purpose of which is to aid the victims of violent crime. From March, 1974 to February, 1976 MCVAP was provided copies of DHC's which served as a source of names and addresses of crime victims in the Marion County area. Informational letters were sent to these victims offering the assistance of MCVAP and its many programs. On February 27, 1976, the director of MCVAP was told that pursuant to an order of Indianapolis Chief of Police Engene Gallagher she would no longer have access to the DHC's. This mandamus action was filed shortly thereafter.
In the trial court the case was decided on a motion for summary judgment. The court ruled the DHC's were public records as defined by the Hughes Anti-Secrecy Act, IC 1976, 5-14-1-2(1) (Burns Supp. 1978) and ordered the Indianapolis Police Department to make copies of the DHC's available to MCVAP. The order was stayed pending this appeal.
The following issues are presented for our review:
First, whether DHC's are public records under the Hughes Anti-Secrecy Act, and whether MCVAP is thereby entitled to access to them?
Second, was mandamus a proper remedy?
Third, do appellants have standing to assert the crime victims' right of privacy?
By reason of our disposition of this appeal we reach only the first two issues.
Appellants vigorously contend DHC's are not public records because the Indianapolis Police Department is not required by any statute, rule or regulation to make or maintain the DHC's. With equal vigor MCVAP asserts the DHC's are public records as defined by the statute and points up the Indianapolis Police Department treats the reports as public records.
The Hughes Anti-Secrecy Act, IC 1976, 5-14-1-1 et seq. (Burns ed.) controls our decision. Section Three of the Act grants every citizen the right of access to public records. What constitutes a public record is defined by IC 5-14-1-2(1):
The term "public records" shall mean any writing in any form necessary, under or required, or directed to be made by any statute or by any rule or regulation of any administrative body or agency of the state or any of its political subdivisions.
The dispositive issue on appeal is whether DHC's are required by any rule or regulation within the meaning of this section. *1364 Indiana precedent is silent on this particular issue, and although anti-secrecy provisions have been enacted in many states,[2] none is sufficiently similar to permit reliance on the judicial interpretations of that jurisdiction as a guide in determining the present question.[3] Indeed, the Indiana provision appears to be unique both in its definition of public records and in the complete absence of any specific exemptions.
The Hughes Anti-Secrecy Act requires that its provisions be liberally construed in favor of disclosure.[4] IC 5-14-1-1. However, the specific grant of the right of inspection extends only to "public records" as specifically defined. IC 5-14-1-3. The limitations on this court are clear. In the construction of statutes, we have nothing to do with questions of policy and political morals; such matters are for the consideration of the Legislature. County Bd of Election Comm'rs of Gibson County v. State ex rel. Sides, (1897) 148 Ind. 675, 48 N.E. 226, 227. Consideration of hardships cannot properly lead a court to broaden a statute beyond its legitimate limits. Fidelity & Casualty Co. of New York v. Miller, (1942) 111 Ind. App. 308, 38 N.E.2d 279, 281. We must examine the language used by the Legislature and give effect to every word and clause if possible, since it is presumed that all language in a statute was used intentionally. Foremost Life Insurance Co. v. Dept. of Insurance, (1979) Ind. App., 395 N.E.2d 418, 425; Evansville-Vanderburgh County Dept. of Health v. Evansville Printing Corp., (1975) 165 Ind. App. 437, 332 N.E.2d 829.
Words of a statute should be given their plain, ordinary and usual meaning, but not taken out of context. United States v. Bradford, (7th Cir.1974) 493 F.2d 1282, cert. denied 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60; Ernst & Ernst v. Underwriters Nat. Assur. Co., (1978) Ind. App., 381 N.E.2d 897; Angel v. Behnke, (1975) 166 Ind. App. 541, 337 N.E.2d 503. Webster's Third New International Dictionary 1986 (3rd ed. 1976) offers altogether twenty-nine different meanings of the noun "rule." Eight mention regulations. One definition of "regulation" is "a rule or order having the force of law issued by an executive authority of a government [usually] under power granted by a constitution or delegated by legislation... ." Id. at 1913. A similar definition is found in Black's Law Dictionary 1451 (4th ed. 1968): "Regulation of an Executive Department. The general rules relating to the subject on which a department acts, made by the head of the department under some act of Congress conferring power to make such regulations and thereby give to them the force of law." This is nothing new. See 1 I.L.E. Administrative Law and Procedure § 27 (West 1957), quoting Burns' Ann.St. § 60-1503, Acts 1945, ch. 120, § 3, p. 251:
.....
The word "rule" means any rule, regulation, standards, classification, procedure, or requirement of any agency, designed to have or having the effect of law or interpreting, supplementing or implementing any statute, but does not include resolutions or directions of any agency relating solely to internal policy, internal agency organization or internal procedure which do not have the force of law and does not include "administrative adjudication."
This statute is presently codified at IC 1976, 4-22-2-3 (Burns Supp. 1978).
The Hughes Anti-Secrecy Act definition refers to "any rule or regulation of any *1365 administrative body or agency ..." (emphasis added). The above definitions are the most specifically directed to this context, and therefore the most appropriate to consider in construing the statutory definition as a whole.
It is presumed that in enacting legislation, the Legislature is aware of existing law on the same subject. Schrenker v. Clifford, (1979) Ind., 387 N.E.2d 59; Speedway v. Nilson, (1979) Ind. App., 395 N.E.2d 1292. Thus, a proper approach in seeking legislative intent is to consider the history of law on that subject. Harris v. Muncie, (1975) 163 Ind. App. 522, 325 N.E.2d 208. See Miles v. State, (1920) 189 Ind. 691, 129 N.E. 10; State v. Ellis, (1916) 184 Ind. 307, 112 N.E. 98; Hurwich v. Zoss, (1976) Ind. App., 353 N.E.2d 549.
At common law, two views existed concerning the definition of public records. The more conservative and prevailing definition included records "required by law to be kept, or necessary to be kept, in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done." Linder v. Eckard, (1967) 261 Iowa 216, 152 N.W.2d 833, 835. The more liberal definition included "all written memorials made by a public officer ... where such writings constitute a convenient, appropriate or customary method of discharging the duties of the office." Disabled Police Veterans Club v. Long, (Mo. Ct. App., 1955) 279 S.W.2d 220, 223. The underlying theoretical approach of the common law right of access has been analyzed as presuming all public records should be subject to inspection. In such case, the determinative issue is whether a particular document may be categorized as "public." Anti-secrecy laws usually differ in that public records are defined very broadly,[5] and the dispositive issue becomes whether a particular document comes within any of the enumerated exemptions. See Note, Iowa's Freedom of Information Act: Everything You've Always Wanted to Know About Public Records But Were Afraid to Ask, 57 Iowa L.Rev. 1163, 1167 (1972).
The original draft of the Hughes Anti-Secrecy Act, as amended by the House Judiciary Committee, provided:
SECTION 1. Every citizen of this state shall have the right during the usual business hours, to inspect any public records of the state or of any political sub-division thereof where such agency is engaged in conduct of matters involving the public interest except where otherwise specifically provided by law.
.....
SEC. 3. All persons having the custody of any state public records of this state, or of county, school, city, town or township records in this state shall furnish proper and reasonable opportunities for the inspection and examination of all the such records requested of their respective offices and reasonable facilities for making memoranda abstracts therefrom, shall be available during the usual business hours, to all persons having occasion to make examination of them such records for any lawful purpose. Provided, however, that nothing in this act shall *1366 be construed to include the records of any police department in this state.

A motion to amend section three so as to exclude student school records was rejected. The Senate Judiciary Committee rejected the House draft in its entirety and substituted what is now the Hughes Anti-Secrecy Act. The rejection inter alia of the proviso relating to police records does not compel the conclusion that all police records were specifically intended to be public. It is more probable that the Senate found the draft overbroad both in its inclusions and exclusions, and chose to remedy both by a narrower definition of public records. Clearly the Senate found the initial draft unsatisfactory as a whole. The Senate's proposed Act imposed a very specific definition of public records, and provided no specific exceptions.
The absence of enumerated exemptions in the Hughes Anti-Secrecy Act is some indication that the common law approach was intended.[6] A stronger indication lies in the statutory definition itself. Considering that the phrase "required by law" would include both statutory requirements and the requirements of any rules promulgated under a valid rule-making power,[7] Indiana's statutory definition of public records is remarkably similar to the stricter of the two common law definitions. In fact, the statute appears to be even stricter in that it excludes the language permitting analysis of necessity in relation to the discharge of a duty imposed by law. The statutory definition clearly limits "public records" to writings which are required to be made, expressly or by necessary inference, by statute or rule or regulation.
The operations of the Indianapolis Police Department were analyzed in State ex rel. Mavity v. Tyndall, (1946) 224 Ind. 364, 66 N.E.2d 755, 757:
Since municipal government in Indiana is of statutory creation, it follows that operation of a city police department requires legislative authority. Undoubtedly the General Assembly might prescribe in detail means and methods for conducting the Indianapolis police department. But the legislature has not chosen to do more than authorize in general terms the Board of Public Safety to establish, regulate and operate a police system. §§ 48-6101, 48-6102, Burns' 1933. In such operation we think it is quite clear that the Board, Chief of Police and other police officers are exercising an administrative function of the executive branch of the government, for the obligation and power to enforce the laws is executive, rather than legislative. In the absence of statutory direction or regulation the power to maintain and operate a city police system carries with it the right and duty to exercise reasonable discretion in such maintenance and operation. Courts should be cautious about interference with such an executive discretion. (Emphasis added).
The adoption of procedures by which to discharge the Police Department's function is committed to the discretion of the officials in charge. The question of whether information collected by operation of internal procedure is considered to be of public record or available to the general public is touched on collaterally in Tyndall.
The plaintiff in Tyndall had been arrested on a misdemeanor charge which subsequently was dropped. He brought suit to compel surrender or destruction of his fingerprints and "mugshot" on the grounds that retention would violate his right to privacy. The court noted that such data is taken either upon direct orders by superiors or according to an established custom, but no duty is imposed on city police by statute.[8] The court discussed Molineux v. Collins, *1367 (1904) 177 N.Y. 395, 69 N.E. 727, a similar case in that there were no statutory directives regarding retention of such matter:
In that case photographs and Bertillon measurements were described as public records taken pursuant to a mandatory statute and as such records not subject to surrender or destruction without a similar mandate. Where, as in the present case, fingerprints and photographs are made in the exercise of an executive discretion and not pursuant to legislative order it would seem that the authority to take would imply the authority to surrender or destroy.
State v. Tyndall, supra, 66 N.E.2d at 759. The court then balanced the plaintiff's privacy interest against the public interest in maintaining the identification system to determine if judicial intervention was necessary. Regarding the fingerprints, the court found that retention did not harm the plaintiff. Unlike the court docket entries of the affidavit, plea, hearing and judgment of dismissal, which can be read by anyone, being public records.
His fingerprints, if they are to be of any value to the police, must be filed in a cabinet and indexed in such a manner that they may be found by one who is qualified to read them. So filed they tell nothing to the idle curious whose gossip might hurt his reputation. They are available and valuable only to the expert searching for criminals and concerned enough, we may assume, to inform himself as to the court's disposition of appellant's case and the final entry of acquittal. How can this harm appellant?
Id. 66 N.E.2d at 760. The court emphasized that as long as the fingerprints are kept in the file, they are harmless. With regard to the photograph, however, the complaint alleged a prima facie case. The court found that placing the plaintiff's picture in a "rogue's gallery" would be a serious violation of his right to privacy:
On the facts alleged in the present complaint he is entitled (upon proof) only to an injunction against the exhibition of his photograph in the "rogues' gallery" above described. As long as the photographs are filed away from public gaze they would seem to be in the same category as the filed fingerprints. There is no occasion for a mandatory injunction.
66 N.E.2d at 762. The court concluded that circumstances may arise in which surrender or destruction of such records may be compelled.
Public records may not be destroyed except in compliance with statutory direction.[9] Liability cannot be imposed for publicizing such records. Cox Broadcasting Corp. v. Cohn, (1975) 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328. While Tyndall does not expressly hold that the materials in question were not "public records," that conclusion is inescapable, particularly in light of the court's reference to Molineux v. Collins, supra. It would have been impossible to reach the result that the court did if the materials in question were public records.
The distinction between procedures mandated by law and procedures adopted in the exercise of authorized discretion relied on in Tyndall is in effect the same as a distinction recognized in Robison v. Fishback, (1911) 175 Ind. 132, 93 N.E. 666, (dicta), between procedures required in the discharge of a duty and procedures to enable the discharge of a duty.[10] Both focus on whether the thing done was itself required by law, not just the result to which it aimed.
In comparing the Hughes Anti-Secrecy Act definition of public records to the *1368 above rule, it appears effectively no different considering that rules promulgated under a valid rule-making authority have the force and effect of law. Coleman v. City of Gary, (1942) 220 Ind. 446, 44 N.E.2d 101, 107 (rule duly adopted by Civil Service Commission of Gary providing demotions procedure for police department had force and effect of law); State ex rel. Julian v. Bd. of Metropolitan Police Comm'rs of Logansport, (1907) 170 Ind. 133, 83 N.E. 83 (by accepting employment on police force, plaintiff became bound by rules and regulations lawfully adopted by board). Being creatures of the legislature, administrative bodies cannot make rules except as the legislature empowers them, otherwise they are invalid. Indiana Dept. of State Revenue v. Colpaert Realty Corp., (1952) 231 Ind. 463, 109 N.E.2d 415; State ex rel. Sights v. Edwards, (1950) 228 Ind. 13, 89 N.E.2d 443; Indiana Environmental Management Board v. Indiana Kentucky Electric Corporation, (1979) Ind. App., 393 N.E.2d 213; Hill v. Review Bd. of Indiana Employment Security Division, (1953) 124 Ind. App. 83, 112 N.E.2d 218.
Legislative authority for making rules respecting the government of the police force is found in IC 1976, XX-X-XX-XX (Burns ed.) which provides that the "[police] chief, with the approval of the director [of Public Safety] shall prescribe, adopt, and put into effect such rules and regulations for the government of the force as, from time to time, he deems appropriate." It is undisputed that DHC's are not made pursuant to any rule promulgated in accordance with this statute. Rather, it is argued that handbooks, issued to all Indianapolis Police Department officers and detailing a procedure for radioing in their DHC reports, constitute a rule or regulation within the meaning of the Hughes Anti-Secrecy Act. To construe them so is at the same time to construe them as invalid, since there is no legislative authority to make rules except according to IC XX-X-XX-XX.
The appellees admit that DHC's are not collected in the discharge of a duty but to aid in the discharge of a duty. The Chief of Police, by virtue of IC 1976, XX-X-XX-XX (Burns Supp. 1978) placing him in charge of the daily operations of the Police Department, may in his discretion collect DHC's to aid in carrying out the function of the Department. According to Tyndall, he may in his discretion surrender, destroy or keep the DHC's in the last instance, subject to balancing the Department's interest against the privacy interest of the person involved. In other words, the DHC's are not public records. We have found this distinction inherent in the Hughes Anti-Secrecy Act definition of public records. The DHC's are not collected in the discharge of a duty, since no statute, rule or regulation imposes such a duty. The same result follows: DHC's are not public records.
The Legislature could have defined the term "Public records" so as to include materials such as DHC's:
The legislature undoubtedly has the power by statute to declare a public policy binding upon a city police department even though the statute does not purport to regulate city police activities.
State ex rel. Mavity v. Tyndall, supra 66 N.E.2d at 757. As it is, the definition in the Hughes Anti-Secrecy Act includes many local police records. See e.g. IC 1976, XX-X-X-XX and -18 (Burns Supp. 1978) (identification information about felons and class A misdemeanants).[11]
Because the appellees have no clear legal right to access to the DHC's, and the appellants have no clear legal duty to give such access, mandamus is not proper in this case. State ex rel. Winkler v. Superior Court of Marion County, (1967) 248 Ind. 424, 229 N.E.2d 648.
We reverse.
MILLER, P.J., concurs with opinion.
CHIPMAN, J., dissents with opinion.
*1369 MILLER, Presiding Judge, concurring.
I concur with Judge Young's opinion.
In attempting to reach the true meaning of the Hughes Anti-Secrecy Act and determine whether the DHC's are public records within the language of said Act "[i]t cannot be presumed that our lawmakers expect their enactments to be applied in an illogical or absurd manner. Pryor v. State, (1973) 260 Ind. 408, 296 N.E.2d 125, 127; In re the Adoption of Jackson, (1972) 257 Ind. 588, 277 N.E.2d 162, 164." City of Indianapolis v. Ingram, (1978) Ind. App., 377 N.E.2d 877, 884. If we were to accept the reasoning of the dissenting opinion we would, in effect, be declaring all internal and confidential investigative reports, including records of confidential informants, to be public records. Most significantly, as noted by Judge Young, Acts 1945, ch. 120, § 3, p. 251 (Burns' Ann.St. § 60-1503), a statute relating to the promulgation of rules by state agencies and in effect at the time of the passage of the Hughes Anti-Secrecy Act expressly provided that the word "rule" did not include "resolutions or directions of any agency relating solely to internal policy, internal agency organization or internal procedure which do not have the force of law." There is certainly a strong presumption that our Legislature, when it enacts a particular piece of legislation, is aware of existing statutes on the same subject matter. Economy Oil Corp. v. Indiana Department of State Revenue, (1974) 162 Ind. App. 658, 321 N.E.2d 215, 218.
I cannot attribute to our Legislature an intent to force police agencies to make available as public records all the internal records and reports of their investigations, which records and reports necessarily must be kept for effective law enforcement. To reach such a result in this case would be wholly illogical and absurd.
CHIPMAN, Judge, dissenting.
This case presents the Court with the difficult task of interpreting the statute before us and applying our interpretation to the facts revealed in the record. I feel the majority has interpreted the Act incorrectly and therefore must dissent.
As the majority points up, Ind. Code 5-14-1-2(1) controls our decision.
The term `public records' shall mean any writing in any form necessary, under or required, or directed to be made by any statute or by any rule or regulation of any administrative body or agency of the state or any of its political subdivisions.
The record contains copies of handbooks which the Indianapolis Police Department distributes to all its officers. The handbooks, one for "accidents" and one for "incidents" are each approximately thirty pages in length. In great detail they direct IPD officers on the proper method and procedure for radioing in their DHC reports. I believe these handbooks constitute a "rule or regulation" within the legislature's intended meaning of those terms.[1] It follows that the DHC's are, in fact, public records. This conclusion is supported by a reading of the Act's substantive and policy provisions and by the legislative history of the Act.
Section one of the Act, Ind. Code 5-14-1-1,[2] is a clear statement of the legislature's *1370 purpose in enacting the Hughes Anti-Secrecy Act. In broad sweeping language it expresses the legislature's concern for a free and open government and the perceived need for public access to government records if that goal is to be attained. The legislature's intent was to provide to the citizens of this state "full and complete information regarding the affairs of government and the official acts of those whom the people select to represent them as public officials and employees." To this end the legislature expressly required a liberal construction of the Act.
Thus the legislative intent to make government records freely available to the public is clear. The legislature, however, certainly did not intend that every government memorialization should fall within the purview of the public records definition. Therefore in addition to stating the liberal policy of the Act, section one contains this explicit exemption: "unless otherwise expressly provided by law... ." With this language the legislature provided itself the option of removing any writing from the purview of the Act.[3]
This option has been exercised in a number of different contexts. For example, Ind. Code XX-X-XX-X makes certain birth records confidential except in limited circumstances. Applying this statutory exemption and the Hughes Anti-Secrecy Act the Attorney General has opined that the home address of parents may not be released to the general public. 1954 Op.Atty. Gen. 155. See Evansville-Vanderburgh County Department of Health v. Evansville Printing Corp., (1975) 165 Ind. App. 437, 332 N.E.2d 829 (a certificate of death registration is not a public record by virtue of the exemption found in Ind. Code XX-X-XX-X).
Nowhere in the statutory scheme is there an exemption for police records. This absence is particularly significant in light of the legislative history of the Act.[4] The bill which eventually became the Hughes Anti-Secrecy Act was introduced by Representative Hughes on January 27, 1953. The Committee on the Judiciary reported the bill back to the full House on February 5, 1953 with this amendment:
Provided, however, that nothing in this act shall be construed to include the records of any police department in this state.
With this language included the legislation was sent to the Senate. The Senate Judiciary Committee substantially rewrote the bill into its present form. Conspicuously absent from the revised bill is the proviso concerning police records. Thus, the lack of a statutory exemption for police records and the history of the Act indicate a conscious legislative decision to include police reports within the definition of public records. County Department of Public Welfare *1371 of Allen County et al. v. Potthoff, (1942) 220 Ind. 574, 44 N.E.2d 494, 498. See State Board of Barber Examiners v. Walker, (1948) 67 Ariz. 156, 192 P.2d 723 (omission of a clause of a bill originally introduced is strong evidence that legislature did not intend omitted matter to be effective).
Even if one were to assume the majority's contention that the Act's legislative history shows an intent to adopt a "conservative" definition, it is abundantly clear that the legislature considered and then rejected an exemption for police records. The significance of the eventual rejection of this exemption is underscored by the fate of a similar proposed exemption. Like the amendment concerning police records, an amendment was proposed to specifically exempt school records from the purview of the Act. This amendment was defeated. The Indiana Attorney General has stated under the Hughes Anti-Secrecy Act the public has a right of access to the records of a public school. 1977 Op.Atty.Gen. 80.
In interpreting the statute the majority has chosen to examine the common law as it existed at the time the Act was passed by the legislature. Although this is certainly a valid approach it is not particularly helpful in this case.
Both the "conservative" and "liberal" common law definitions of public record have been soundly criticized by the commentators. Note, Iowa's Freedom of Information Act: Everything You've Always Wanted to Know about Public Records but Were Afraid to Ask, 57 Iowa L.Rev. 1163 (1972); Project, Government Information and the Rights of Citizens, 73 Mich.L.Rev. 971, 1163. In addition, the commentators view the Hughes Anti-Secrecy Act an expansion of the common law definitions. Project, supra at 1163, n. 1169. This is consistent with the explicit policies of liberal interpretation and open public access to government records as expressed in section one of the Act. Finally, and most importantly, there has never been a judicially adopted common law definition of public record in the history of this state. The only case to discuss the issue is Robison v. Fishback, (1911) 175 Ind. 132, 93 N.E. 666. The Robison court recited the more restrictive common law definition, but expressly approved the "liberal" definition. Thus the common law is not instructive in interpreting the Act.
I am deeply troubled by the majority's discussion of State ex rel. Mavity v. Tyndall, (1946) 224 Ind. 364, 66 N.E.2d 755, especially the emphasis on the "executive discretion" of the police department. Although I heartily endorse the exercise of reasonable discretion as a necessary aid to the efficient operation of a municipal law enforcement agency, see Ind. Code XX-X-XX-XX, I am equally convinced of the need for control of that discretion. Apparently the Tyndall court had similar views. The opinion contains this language:
The legislature undoubtedly has the power by statute to declare a public policy binding upon a city police department even though the statute does not purport to regulate city police activities.
Id. 66 N.E.2d at 757. The court clearly envisioned the applicability of legislative enactments to city police departments. I submit that even the greatest degree of "executive discretion" is not sufficient license to sanction noncompliance with general statutory mandates.
In conclusion, I feel compelled to issue a word of warning. The majority has left the right of public access to routine police records to the nearly unfettered discretion of the police department. The implications of this decision are alarming.
In this case the Indianapolis Chief of Police chose to cut off the MCVAP's access to DHC's. The Chief thereby denied a vital source of information to a private, not-for-profit group of concerned citizens whose sole purpose is to aid the victims of violent crime and whose activities do not pose even an inconvenience to the operation of the IPD.[5] This arbitrary denial of access to the *1372 MCVAP raises disturbing questions. The record reveals insurance companies, other government agencies, some private individuals and twenty-four organizations of the Indianapolis print and broadcast media are routinely permitted access to the DHC's. Under the holding of the majority, any one of these groups is in danger of being denied access by the chief of police. The same is true with regard to similar groups in other municipalities across the state. The specter of denial of access to the press thus becomes an ugly, but real, possibility. I would consider such a situation to be clearly violative of the First Amendment right to a free press, notwithstanding the greatest degree of "executive discretion."
I do not mean to imply that the majority has sanctioned the infringement of the right to a free press by law enforcement officials. The question is not even tangentially before this Court. However, I am especially cognizant of the precedential value of this decision and believe this Court has opened a Pandora's box which might result in such a controversy. Pandora's mistake should not be ours.
NOTES
[1] The acronym stands for Detective Has Copy.
[2] See generally Note, State Open Records Laws, 73 Mich.L.Rev. 1163 (1975).
[3] Police reports including names and addresses of rape victims have been held to be public records, under radically different anti-secrecy statutes however. See e.g. Ayers v. Lee Enterprises, Inc., (1977) 277 Or. 527, 561 P.2d 998, 86 A.L.R.3d 72; Poteet v. Roswell Daily Record, Inc., (1978) 92 N.M. 170, 584 P.2d 1310. McMahan v. Board of Trustees of the University of Arkansas, (1973) 255 Ark. 108, 499 S.W.2d 56, is somewhat comparable in that access is afforded only to records which are required to be kept and maintained by law.
[4] IC 5-14-1-5 is irrelevant since it assumes an initial determination has been made that the writings in question are "Public records" under the definition section.
[5] For instance, Section 68A.1 of the 1971 Iowa Code defines "public records" as "all records and documents of or belonging to this state or any county, city, town, township, school corporation, political subdivision, or tax-supported district in this state, or any branch, department, board, bureau commission, council, or committee of any of the foregoing." (Emphasis added). Ayers v. Lee Enterprises, Inc., supra fn. 2, applied the following definition:

`Public record' means a document, book, paper, photograph, file, sound recording or other material, regardless of physical form or characteristics, made in pursuance of law or in connection with the transaction of public business, whether or not confidential or restricted in use. `Public records' includes correspondence, public records made by photocopying and public writings, but does not include:
(a) Records of the Legislative Assembly, its committees, officers and employes.
(b) Library and museum materials made or acquired and preserved solely for reference or exhibition purposes.
(c) Extra copies of a document, preserved only for convenience of reference.
(d) A stock of publications.
ORS 192.005(5), Oregon Laws 1961, ch. 160, § 2. (Emphasis added).
[6] The Act is clearly not a mere codification of the common law, however. We consider the common law in this case only as an object of comparison.
[7] See Wallace v. Dohner, (1929) 89 Ind. App. 416, 165 N.E. 552; 1953 Op.Atty.Gen. 208 (valid regulations, adopted by an administrative body pursuant to statutory authority, constitute in effect part of the statute).
[8] The predecessor of IC 1976, XX-X-X-XX (Burns Supp. 1978) did not require information about persons who committed misdemeanors other than those listed in the statute. Acts 1945, ch. 344, § 12, p. 1622.
[9] See IC 1976, 5-15-1-1 and 5-15-5-3 (Burns Supp. 1978).
[10] The court discussed both the strict and liberal common law views regarding public records in addition to the above distinction. The court held that certain indexes belonged to the office, not the officer, on the grounds that they were indispensable to the discharge of the duties of the office, limiting its decision to the facts of that case and expressing doubt that the indexes were public records "in the strict sense." 93 N.E. at 668.
[11] IC 1976, 10-1-2.5-1 to -4, is inapplicable to this case, since section three expressly provides that the Criminal Justice Data Division may obtain no data except that which is a public record.
[1] The majority suggests the statutory interpretation espoused in this dissent would construe the regulations as invalid because they were not promulgated pursuant to Ind. Code XX-X-XX-XX. I cannot agree. The Court's purpose here is to determine the legislative intent behind the Hughes Anti-Secrecy Act. The Act was passed in 1953. Acts 1953, ch. 115, § 2, p. 427. Thus, among other things, we must determine what the legislature meant when, in 1953, it adopted the term "rule or regulation" as part of the statutory definition of public record. Ind. Code XX-X-XX-XX was passed in 1969, Acts 1969, ch. 173, § 1222, p. 357. Therefore, Ind. Code XX-X-XX-XX is irrelevant to an ascertainment of the intent of the 1953 legislature.
[2] Pursuant to the fundamental philosophy of the American constitutional form of representation government which holds to the principal [principle] that government is the servant of the people, and not the master of them, it is hereby declared to be the public policy of the state of Indiana that all of the citizens of this state are, unless otherwise expressly provided by law, at all times entitled to full and complete information regarding the affairs of government and the official acts of those whom the people select to represent them as public officials and employees.

To that end, the provisions of this act [5-14-1-1 - 5-14-1-6] shall be liberally construed with the view of carrying out the above declaration of policy.
[3] The exemption provisions in some state public records acts are contained in the act itself, usually as a nonexhaustive list. E.g., Md. Ann. Code art. 76A §§ 1, 3 (Supp. 1979); N.Y. Pub. Officer's Law § 87 (Supp. 1979-80). See generally 63 Md.Op.Atty.Gen. (1979) (police reports are subject to public disclosure unless they fall within specific exemption). Indiana has not adopted this approach but has chosen to place exemptions at various places throughout the total statutory scheme. Other jurisdictions have done the same. E.g., Ark.Stat. Ann. § 12-2804 (1979); Mo. Ann. Stat. § 109.180 (1966). See generally Herald Co. v. McNeal (8th Cir.1977) (in the context of federal absention court held it was reasonable to construe Missouri public records act to permit public access to police reports).
[4] This excursion into the archival history of the Act is well supported. The United States Supreme Court has held an examination of legislative history is permitted in the presence or absence of ambiguity in statutory language. "[W]ords are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how `clear the words may appear on superficial examination.'" Harrison v. Northern Trust Co., (1943) 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407, quoting United States v. American Trucking Assn's, (1940) 310 U.S. 534, 543-44, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345. This necessarily includes a consideration of the legislature's treatment of amendments and modifications as a bill passes through the legislative system. Decatur Tp. et al. v. Board of Commissioners of Marion County et al., (1942) 111 Ind. App. 198, 39 N.E.2d 479, 483.
[5] The services of the MCVAP are offered unconditionally and free of charge. Similar services are offered by the IPD, but are provided only to those crime victims who agree to prosecute and co-operate with police investigations.